# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES MARTIGNONI<br>    Petitioner,<br><br>v.<br><br>UNITED STATES<br>    Respondent. | ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>Civil Action: 10-cv-06671-UA<br><br>REFER NO. 92-1097-JFK |

## MR. MARTIGNONI'S PETITION FOR A WRIT OF *CORAM NOBIS*

Pursuant to 28 U.S.C. 1651(a) Petitioner James Martignoni ("Petitioner" or "Mr. Martignoni") hereby petitions and moves for a writ of *coram nobis* to vacate Petitioner's conviction to correct an error of the "most fundamental character" and prevent a manifest injustice from occurring.  After completing a sentence of incarceration and probation, Petitioner not only "stands convicted of an 'act that the law does not make criminal'" under the recent holding of *Skilling v. United States*, 561 U.S.__ (2010), but also faces now the most Draconian criminal penalty in the form of deportation from the United States which would separate him from his two minor children who are natural born Citizens of the United States.  But for the retroactive application of the post-conviction immigration amendments to the very same unlawful conviction, Mr. Martignoni would not be ordered "the equivalent of banishment or exile" from the United States.[1]

---

[1]  *In Re the Matter of James Martignoni*, A 41-623-010 (Gagnon, J.) (May 4, 2010) ("Immigration Order"), a true and accurate copy is attached hereto as Exhibit A.  Petitioner has filed with the Board of Immigration Appeals Notice of Appeal from a Decision of an Immigration Judge on behalf of James Martignoni, #A041-62-010, dated

To ignore the post-conviction Supreme Court case of *Skilling v. United States*, *supra*, would continue to exacerbate this error of the "most fundamental character." *Skilling* squarely holds that a fraudulent scheme to deprive another of honest services under the mail, bank and other fraud statutes (i.e., Chapter 63 of Title 18) criminalizes only those schemes that include a bribe or kickback. *Id.* at slip op. at 45. Petitioner's predicate conduct underlying his conviction was a scheme to defraud honest services under the bank fraud statute that did not include a single bribe or kickback. An immigration court, however, has ordered to remove Mr. Martignoni from the United States on the basis that his conviction is an "aggravated felony" and this finding bars him virtually from all relief against this deportation under the post-conviction immigration amendments. 8 U.S.C. § 1101(a)(43)(i); Immigration Order, attached as Exhibit A. A writ *coram nobis* would prevent the absurd outcome of being deported for a conviction where the offense conduct is <u>not</u> criminal.

Petitioner requests a hearing and further briefing, though the basic factual and legal framework is set forth below. In addition, Petitioner requests that the undersigned counsel be admitted to this Court as set forth in the accompanying Motion for Admission *Pro Hac Vice* filed with this Petition.[2]

## I.  FACTUAL BACKGROUND AND THE CONVICTED OFFENSE

Mr. Martignoni is 46 years old, and is married to a natural born Citizen of the United States. He has two minor children from a former marriage, whose ages are 11 (boy) and 9 (girl). His children along with their mother are natural born Citizens of the United States. Mr. Martignoni lives with his wife in Newton, Massachusetts where his children live with their

---

May 26, 2010 ("Notice of Appeal of Immigration Order"). Mr. Martignoni promptly filed with this Court this *coram nobis* petition following the ruling of *Skilling v. United States*, *supra*, on June 24, 2010.

[2]   On behalf of Mr. Martignoni, undersigned local counsel simultaneously filed with this filing a Motion for Admission *Pro Hac Vice* with the necessary affidavit and certificates of good standing for the undersigned attorney.

mother, his former wife.  As provided in his divorce agreement, Mr. Martignoni participates in his children's lives through the sharing of custody during the week and weekends as scheduled, and provides financial support from his employment as a software engineer.[3]

Seventeen years ago in what was the only criminal matter in his entire life, a Jury convicted Mr. Martignoni of various charges all stemming from the theft of honest services scheme from his former employer where he benefited in the form of salary, bonus and continued employment.  Notably the scheme did not entail a single bribe or kickback.  Mr. Martignoni satisfied his sentence of 21 months of incarceration followed by three years of probation.

To place the underlying conduct in context, the story began when Mr. Martignoni lawfully entered the United States from his country of citizenship, Australia, to relocate to his then wife's hometown of Cambridge, Massachusetts, at the age of 24 years old.  For his first two years, he worked as a currency trader at a Boston bank until ABN-AMRO, one of the world's largest banks, recruited him to its New York office to run and operate its foreign currency option desk.  He was paid a salary of $110,000, which more than doubled his Boston salary, and a bonus, which was based on his performance.

Less than a year after he was hired, in or around October/November, 1991, Mr. Martignoni's boss informed him that he would be earning a $200,000 bonus, which he would never receive.  By all accounts, at 26 years old, he was deemed "an excellent trader" and a "rising star."  Trial Tr. 1311:24; 1312:22 (Nov. 8, 1993), a true and accurate copy is attached hereto as Exhibit B.

At the end of November, 1991, Mr. Martignoni was scheduled for an Australian vacation following his business travel to ABN-AMRO's corporate headquarters in Amsterdam.  As he

---

[3]   *See Hartry v. Martignoni,* Docket No. 05D-0134-DVI (Middlesex Probate Family Court, Commonwealth of Massachusetts).

was going to be away from the options desk for a month, his boss told him to "lighten his load" before he left.  Mr. Martignoni sold off positions from his portfolio as requested and also purchased additional new options.  Trial Tr. 1319:16-25 (Nov. 8, 1993), a true and accurate copy is attached hereto as Exhibit C.

## A.  The Alleged And Convicted Honest Services Scheme.

The Government never challenged that Mr. Martignoni's actual trades, including the newly purchased options, were anything other than legitimate trades.  But rather, it argued that Mr. Martignoni falsely assigned inflated volatilities to these newly purchased options and Ms. Kristen Burch, his trading assistant, a co-conspirator and government witness ("Ms. Burch" or "co-conspirator and government witness"), then entered the inflated volatilities into ABN-AMRO's internal trading systems while he was in Amsterdam.

In essence, the thrust of the Government's case was that Mr. Martignoni's honest services fraud scheme was to inflate the volatilities on these newly purchased options, thereby creating a higher valuation (even though the profits or losses were yet to be realized and not real) so as to hide those positions Mr. Martignoni had sold off at a loss in his portfolio.  In addition, his trading assistant, a co-conspirator and government witness, who had entered these volatilities, then decided to further hide the loss by altering a decimal point on trading tickets such that the sold positions were reflected at a ten fold price increase from that sold.  The evidence was that Ms. Burch did this decimal switching on her own ("It was all my idea")[4] and Mr. Martignoni failed to report this to his boss.  The Government argued that these internal systems valued Mr. Martignoni's portfolio at a higher overall valuation.  Basically, the Government argued that Mr. Martignoni hid the losses of the sold options in the portfolio to keep his job, salary and to receive the unpaid bonus.

---

[4]    Trial Tr 302:23 (October 27, 1993), a true and accurate copy is attached hereto as Exhibit D.

Notably, at any given time, Mr. Martignoni's boss or anybody at ABN-AMRO could have easily valued Mr. Martignoni's option portfolio based on varying market prices obtained from impartial external sources.  In fact, the Government readily conceded, and this Court agreed, that ABM-AMRO was not without its own culpability where it failed to follow federal banking regulations and its own policy on options trading, invest in necessary computer systems for complex foreign currency trading, train Mr. Martignoni, provide accounting assistance when Mr. Martignoni requested additional personnel to support his trading, and check and/or challenge Mr. Martignoni's methodology for valuing his portfolio which contained real profit/loss and unrealized profit/loss.  Indeed, this Court found that ABN-AMRO's wrongful conduct contributed significantly to Mr. Martignoni's conduct.[5]

### i.   The Atypical Nature of the Intangible Right to Honest Services Theory.

Nonetheless, the Government argued that Mr. Martignoni's employer trusted him and he violated that trust.  From the Indictment through Trial, the thrust of the Government's case was simply that Mr. Martignoni had deprived his employer, ABN-AMRO bank, of its intangible right to honest services and deprived the bank of its property when he benefited "in the form of salary, bonus and continued employment." *Indictment* ¶¶ 4 and 11.  Where the theft of the intangible right of honest services did not involve a single kickback or bribe allegation this was an atypical private honest services case.

---

[5]   At sentencing, this Court in finding that U.S.S.G. § 5k2.0 was applicable and stated:
   I believe that ABN-AMRO, by its wrongful conduct, contributed significantly to the offense behavior here. The bank did not train Mr. Martignoni, and when he sought help by asking Mr. Geslak be transferred to the options desk, he didn't receive any help.

   Further, the bank failed to follow its own policy or the federal recommendations concerning the options trading.

   Sentencing Tr. 27:16-24, (Mar 15, 1994), a true and accurate copy attached hereto as Exhibit E.

It was not surprising then, and particularly in the wake of *Skilling v. United States,* 561

U.S.___ (2010), that the Government's own key witness, Mr. Martignoni's trading assistant and

co-conspirator, never believed her actions were criminal and testified as such:

> Q.  Because at no time had you any intention to victimize the bank or to steal anything or to do anything but to stall for your boss to get back to the United States isn't that correct?
>
> A.  Yes.
>
> Q.  In any event, you would agree that at no time until long after these events did you view anything you had done as illegal, isn't that correct?
>
> A.  No, I didn't, think I did anything illegal.
>
> . . .
>
> Q.  You never had the intention to come to any agreement, tacit, explicit, or otherwise, with Mr. Martignoni, to do anything illegal, isn't that correct?
>
> A.  Had I known it was illegal, I wouldn't have done it.
>
> . . .
>
> Q  Your intentions were never to do anything illegal, correct?
>
> A.  Right.

Trial Tr. 308:22-25; 309:1; 311:4-7; 312:2-12 (Oct 27, 1993), a true and accurate copy is

attached hereto as Exhibit F.  The conduct of hiding losses by Mr. Martignoni and his co-

conspirator, namely inflating valuation of volatility of other options, which was subjective, and

the decimal switching, reflected bad judgment.  And, the government's witness and co-

conspirator, readily admitted she "just wanted to buy time" until her boss came back from

Amsterdam to address the problem.  Trial Tr. 303:17-19; 305:10 (Oct. 27, 1993), a true and

accurate copy is attached hereto as Exhibit G.

Despite this, the Government convinced the Jury that Mr. Martignoni committed an array

of offenses when he "abused the fundamental trust place in him" by his employer.  Trial Tr.

14:17-18 (Oct. 20, 1993), a true and accurate copy attached hereto as Exhibit H.  The honest

services theory was so inextricably related to all of the charges that the Government in its

opening statement immediately after "May it please the Court..." described Mr. Martignoni's

case as follows:

> This is a case about fraud.  It is not about a fraud to obtain money or a car or jewelry.  It
> is about a fraud relating to something that you cannot see or touch.  It is something
> intangible and it's something that the law recognizes as the intangible right to honest
> services. You will recognize it as plain trust.

*Id.* at Exhibit H, lines1-6.  This central theme continued right until closing, where the

Government argued:  "For 110, 000 a year and an approved bonus of 200,000 or more...ABN

had at least the right to expect for Mr. Martignoni to act honestly."  Trial Tr. 1303:14-17 (Nov. 8,

1993), a true and accurate copy attached hereto as Exhibit I.  The honest services fraud theory

greatly influenced the requisite intent and the entire conviction.

Mr. Martignoni was convicted of: i) one conspiracy count under 18 U.S.C § 371 where

object of the conspiracy was to commit false entries of bank records under 18 U.S.C. § 1005 and

bank fraud under18 U.S.C. §§ 1344, 1346; ii) two counts of bank fraud under 18 U.S.C. §§ 1344,

1346, and 18 U.S.C. § 2; and iii) 13 counts of false entries of bank records under 18 U.S.C. §

1005 and 18 U.S.C. § 2.  Mr. Martignoni unsuccessfully appealed on several grounds, including

that the constitutionality of the theft of honest services statute, and fully completed his sentence.

### B. Immigration's Role As A Result Of The Conviction.

#### i. Prosecutorial Discretion to Not Deport Until 2008.

While in prison in 1994, Mr. Martignoni received a Notice of Detainer from INS.[6] His attorney requested "Prosecutorial Discretion" to not proceed with deportation proceedings, and if any deportation should proceed that it should proceed in Boston and not in Oakdale, LA.[7] When Mr. Martignoni was released from prison, he freely returned to his then wife and home in Massachusetts to start their family. Their son was born in 1998 and daughter in 2000. In 2002, Mr Martignoni again requested that the Government not proceed with deportation proceedings in response to his request that he be allowed "to renew his permanent resident card so that he may continue to live in the U.S. with his family, to work, and to travel without fear of being arrested or detained." The Government approved Mr. Martignoni's I-90 application to replace his permanent resident card, and characterized Mr. Martignoni's "current immigration status [as] that of a lawful permanent resident."[8]

---

[6]   Mr. Martignoni is appealing whether the amended definition of "aggravated felony" under the immigration laws apply to him where the "actions occurred" (i.e., a notice of detainer on August 1, 1994) prior to the enactment date of § 321 of the Illegal Immigration and Reform Responsibility Act of 1996 (IIRRA), which amended the aggravated felony definition set forth in § 101(a)(43)(M)(i) of the Immigration Nationality Act (INA). The amendment was to apply to actions taken on or after the date of the enactment of the amendment, i.e. September 30, 1996, regardless of the date of conviction. *See* Notice of Appeal of Immigration Order.

[7]   Mr. Martignoni's indicated his intent and reliance on the discretionary relief available from any potential deportation as provided under § 212(c) of the INA in effect in 1994. *See* FN 8. Though Mr. Martignoni was detained in New York in 2008, his deportation proceedings were transferred to Boston. As a result of this forum shopping Mr. Martignoni is further denied relief still available under INA despite the enactment of IIRRA. The Second Circuit has held that *Ins St. Cyr*, 533 U.S. 289 (2001) provides authority for § 212(c) relief to still be available to an alien who relied on such relief following a conviction by trial. Whereas the First Circuit has limited this relief only to those aliens who pled guilty and relied on this relief. *Restrepo v. McElroy*, 369 F.3d 627, 631-40 (2d Cir.2004) ("alien [convicted by trial] may show detrimental reliance when he decides to "forgo the immediate filing of a 212(c) application based on the considered and reasonable expectation that he would be permitted to file a stronger application for 212(c) relief at a later time."). *Compare Dias v. INS*, 311 F.3d 456 (1st Cir. 2002) (holding that the former 212(c) is unavailable where the alien was convicted following trial). *See* Exhibit A at p.3 § C.

[8]   *See Respondent's Letter to INS*, dated December 8, 1994; *Respondent's Letter to INS Boston*, dated September 8, 2002, *Deputy District Director Denis C. Riordan's letter*, dated October 17, 2002. Each of these documents is part of the immigration record.

Relying on this decision to exercise "Prosecutorial Discretion," Mr. Martignoni traveled freely in and out of the United States on 12 different occasions following his conviction. Each time, he returned to the United States without being detained or placed in removal proceedings having entered into the United States through various different entry points (i.e., international airports, etc.) as dictated by his particular travel. As such, on July 16, 2008, as he had done so many times, Mr. Martignoni traveled to Madrid, fully believing that he would return to his family in the United States on July 19, 2008 as he was a lawful permanent resident.

### ii.  Removal Hearing in 2008.

Instead, on his 13th visit abroad, the Government deviated dramatically from its prior decision to exercise "Prosecutorial Discretion," and detained Mr. Martignoni when he returned to the United States on July 19, 2008 via New York's J.F.K. International Airport. Removal hearings proceeded in Boston before Immigration Judge Paul Gagnon.

A central argument before the immigration court was whether the theft of honest services involved fraud or deceit in which the loss to the victim exceeded $10,000 as this would then constitute an "aggravated felony" and Mr. Martignoni would be automatically removed under the immigration laws.[9] At the time of his conviction in 1994, not one of Mr. Martignoni's offenses was deemed an "aggravated felony" as none of the offenses entailed murder, drug trafficking, crime of violence or money laundering offense where the sentence imposed was five or more years. As such, he was eligible for waiver relief were deportation hearings to proceed. *See* FN 7.

The Government, through U.S. Department of Homeland Security, sought to establish that the amount of the intangible loss relating to the theft of honest services from the conduct of almost 20 years ago was $70 million. It then later argued that loss amount of the theft of honest

---

[9]   8 U.S.C. § 1101(a)(43)(i).  § 101(a)(43)(M)(i) of the Immigration Nationality Act of 1996.

services was the amount of Mr. Martignoni's full salary and anticipated bonus. In particular, it and the Immigration Court relied on this Court's statement that "Mr. Martignoni's salary and bonus of an amount between 200,000 and 300,000 is the appropriate loss to be recognized and calculated in this case for guideline purposes."[10] Mr. Martignoni has appealed this finding on several grounds including that standard of evidence for sentencing and immigration removal hearings differ, that changes in sentencing statute would necessarily result in a loss finding for sentencing that accounts for the services actually rendered, that the overt acts occurred over an eight day period and the loss should be his prorated salary for this period, that the post-conviction amendments to the immigration statute are not applicable to him, and the possibility that Mr. Martignoni's conduct would no longer be deemed unlawful given the anticipated decisions from the Supreme Court. *See* Notice of Appeal of Immigration Order.

## II.   LEGAL ARGUMENT

### A. Writ Of *Coram Nobis* Vacating Mr. Martignoni's Conviction Is Necessary Where Mr. Martignoni is Being Removed For A Wrongful Conviction.

The writ of error *coram nobis* under 28 U.S.C. § 1651(a) ("All Writs Act") invokes this Court's power to set aside or vacate Mr. Martignoni's conviction. *United States v. Morgan*, 346 U.S. 502 (1954); *Nicks v. United States*, 955 F.2d 161, 167 (2d Cir.1992); *Foont v. United States*, 93 F.3d 76, 79 (2d Cir.1996); *United States v. Mayer*, 235 U. S. 55 (1914). This "extraordinary remedy" is necessary in this matter as there are "circumstances compelling such action to achieve justice." *United States v. Morgan*, 346 U.S. at 511. Without this Court invoking its power under the All Writs Act, "a wrong may stand uncorrected which the available remedy

---

[10]   Sentencing Tr. 26:5-7, (March 15, 1994), a true and accurate copy attached as Exhibit J;Exhibit A (Immigration Order) at p.4, ¶3. This Court's finding was based on a preponderance of evidence and the sentencing guidelines in effect then, whereas the immigration judge was to find evidence based on clear and convincing standard.

would right." *Id.* at 512.  Simply put, Mr. Martignoni is in a straight jacket as he faces

retroactivity jurisprudence on multiple levels.

At the time of his conviction, Mr. Martignoni had relief from being deported as his

offense was not was not deemed an "aggravated felony" under the immigration statute in effect

at that time.  *See* FN 7.  At the time, an "aggravated felony" was defined as murder, drug

trafficking crimes, or illicit trafficking in firearms or destructive devices as set forth under the

Anti Drug Abuse Act of 1998, and slightly expanded by the Immigration Act of 1990.[11]  At that

time, his offense conduct had yet to be deemed not criminal as *Skilling v. United States,* 561

U.S.__ (2010) was 17 years in the making.

Today, Mr. Martignoni "stands convicted of an 'act that the law does not make

criminal.'"  *Bousley v. United States,* 523 U.S. 614, 620 (1998) (*quoting Davis v. United States,*

417 U.S. 333, 346 (1974)); *Skilling v. United States,* 561 U.S.__ (2010).  Indeed, after *Skilling*;

*supra,* 18 U.S.C. § 1346 "criminalizes *only* the bribe and-kickback" type of honest services fraud

schemes.  *Id.* at slip op. at 45 (no emphasis added).  Mr. Martignoni's case, which was

prosecuted under the very same statute, was not this type.

Since his conviction, there have been two critical amendments to the immigration laws.

In 1994, though Congress expanded the definition to include offenses of tax evasion and fraud or

deceit for which the loss exceeded $200,000, this amendment did not apply to Mr. Martignoni as

Congress limited its application to convictions entered on or after the date of the amendment's

enactment.  In 1996, Congress further expanded the term "aggravated felony" to include those

offenses already included previously but where the term of imprisonment was one (not five) or

more years, and reduced the loss amount from $200,000 to $10,000.  This time Congress

---

[11]   Immigration Act of 1990 expanded the definition of "aggravated felony" to include other offenses such as, a crime of violence 18 U.S.C. § 16 or money laundering under 18 U.S.C. § 1956 for which the imprisonment was at least five years.  In any event, Mr. Martignoni's offense was not deemed an "aggravated felony."

indicated that this particular provision applies regardless of the date of conviction to immigration actions commenced after the enactment of the amendment. *See* FN 6.

From this, the immigration court has retroactively applied the post-conviction immigration amendments to Mr. Martignoni's offense conduct and it now deems his offense as an "aggravated felony" making him ineligible for relief from his removal from the United States. Immigration Order, Exhibit A. This finding is being appealed.[12]. Mr. Martignoni's removal would necessarily result in his leaving his two minor children in the United States given his divorce.[13]

Where Mr. Martignoni has served his sentence and "the power to remedy an invalid sentence exists," Mr. Martignoni is "entitled to an opportunity to attempt to show [his] conviction was invalid." *United States v. Morgan,* 346 U.S. at 513. For this relief, Petitioner must show that there are: "1) there are circumstances compelling such action to achieve justice, 2) sound reasons exist for failure to seek appropriate earlier relief, and 3) the petitioner continues to suffer legal consequences from his conviction that may be remedied by the granting of the writ." *Foont v. United States*, 93 F.3d 76, 79 (2d Cir. 1996) (*citations omitted*).

As shown, *infra,* these three prongs are readily established because of two pivotal facts: i) the recent Supreme Court decision in *Skilling v. United States, supra,* renders Mr. Martignoni's conviction unlawful where it was based on predicate conduct that now is specifically deemed not criminal and unlawful under 18 U.S.C. §§ 1344, 1346 <u>and</u> ii) the Immigration Order requiring

---

[12] *See* Notice of Appeal of Immigration Order, FN 6 and 7, *infra.*

[13] Deporting Mr. Martignoni from the United States would place him in the untenable position whereby he would be unable to visit and have his minor children stay weekly with him as per the divorce agreement. Furthermore, the divorce agreement, specifically prohibits Mr. Martignoni from traveling outside of the United States with his minor children given the complexities of international laws and divorce agreements. Mr. Martignoni is free to travel with his children throughout the United States. *See Hartry v. Martignoni,* Docket No. 05D-0134-DV1 (Middlesex Probate Family Court, Commonwealth of Massachusetts).

Mr. Martignoni to be removed from the United States is an obvious, continuing and significant legal consequence of his conviction.

### B. The Government Could Not Prosecute Mr. Martignoni Today For Theft Of Honest Services Where Mr. Martignoni's Case Did Not Involve A Bribe Or Kickback.

Unequivocally, the Supreme Court has refused to extend the honest services theory to the type of conduct that does <u>not</u> involve "the paradigmatic cases of bribes and kickbacks." *Skilling v. United States*, 561 U.S.___ (2010), *s*lip op. at 47. It held that a "scheme or artifice to deprive another of the intangible right of honest services" under 18 U.S.C. § 1346 "criminalizes *only* the bribe and-kickback" schemes where a third party is involved. *Id.* at slip op. at 45 (no emphasis added). The Supreme Court characterized these bribe and kickback schemes as the "core ...honest services fraud precedents" beginning with the first honest services case in 1941. *Id.* at slip op. at 44 and 35 (*citations omitted)*.

The Supreme Court determined that defendant Skilling's scheme to misrepresent the financial health of his employer which thereby artificially inflated stock prices did <u>not</u> constitute honest services fraud under 18 U.S.C. § 1346 even where the defendant benefited by his salary and bonus, and the sale of his stock. The Supreme Court stated "we resist the Government's less constrained construction absent Congress' clear instruction otherwise." *Id.* at slip op. at 47.

Notably, this is the second time the Supreme Court has curtailed the use of the intangible right of honest services theory applied in the mail, bank and other fraud statutes. *McNally v. United States*, 483 U.S. 350 (1987). In *McNally*, the Supreme Court "stopped the development of the intangible-rights doctrine in its tracks" and stated "If Congress desires to go further, it must speak more clearly than it has." 483 U. S. 350, 360 (1987); *Skilling, s*lip op. at 37. Congress then enacted 18 U.S.C. § 1346 in an attempt "specifically to cover one of the

'intangible rights' that lower courts had protected . . . prior to *McNally*: 'the intangible right of honest services.'" *Id.* at 361 (*quoting Cleveland v. United States*, 531 U. S. 12, 19–20 (2000)). Once again, the Supreme Court is requiring more instruction from Congress for criminalizing an atypical honest services case, such as Mr. Martignoni's case where the honest services scheme did not involve a single kickback or bribe. *Skilling, s*lip op. at 47.

     i.    **Mr. Martignoni is Entitled to Have the Rule of *Skilling v. United States* Applied Retroactively to his Conviction.**

     In *Skilling v. United States, supra,* the Supreme Court created a new substantive rule when it narrowed the scope of 18 U.S.C. § 1346 by limiting it only to those schemes involving a bribe or kickback.  Mr. Martignoni is entitled to have this new substantive rule applied retroactively to his conviction for which he has already served his sentence. *Schriro v. Summerlin*, 542 U.S. 348 (2004) (*citing Bousley v. United States,* 523 U. S. 614, 620.621 (1998)); *see also Davis v. United States*, 417 U.S. 333 (1974) (applying retroactively in the context of *habeas corpus* petition); *United States v. Travers*, 514 F.2d 1171 (2d Cir. 1974) (granting *coram nobis* petition involving retroactive dispositive change in the law of mail fraud pursuant to *Davis v. United States, supra*); *United States v. Mandel*, 862 F.2d 1067 (4th Cir.1988), *cert. denied*, 491 U.S. 906 (1989) (court under *McNally* reversed the entire conviction under a *coram nobis* petition).  Mr. Martignoni's conviction is one of "those cases where the errors were of the most fundamental character -- that is, such as rendered the proceeding itself irregular and invalid." *United States v. Mayer*, 235 U. S. 55, 69 (1914); *United States v. Morgan,* 346 U.S. 502, 512 (1954).  To be prosecuted for offense conduct that is not criminal is such an error, and may be addressed with this Court issuing a writ of *coram nobis* vacating the conviction.

The Government indicted, and the Jury convicted, Mr. Martignoni based on the Government's principal allegation and theory of the case that Petitioner had deprived his employer, ABN-AMRO bank, of its intangible right to honest services and benefited "in the form of salary, bonus and continued employment." *Indictment* ¶¶ 4 and 11. The Government's honest services theory was so inextricably related to each of the 16 counts that the entire conviction should be set aside under *Skilling v. United States, supra*.

Indeed, the Government's honest services theory was present from the inception of this case to the end. The theory in the Indictment was immediately presented to the Jury. Indeed, the first line of the Government's opening statement: "This is a case about fraud. . .. It is about a fraud relating to something that you cannot see or touch. It is something intangible and it's something that the law recognizes as the intangible right to honest services." And this theory was prevalent during the Trial and right through the Government' closing where it argued that ABN-AMRO "had at least the right to expect Mr. Martignoni to act honestly." Exhibits I and J.

In short, the nature of the evidence, including the Government's principal witness, Ms. Burch, was so intertwined with this legally invalid honest services theory that it would be difficult to separate an offense that did not include this legally invalid honest services theory in some form or another. Ms. Burch's testimony was that Mr. Martignoni instructed her to enter certain entries into ABN-AMRO internal systems concerning option volatility rates for purposes of furthering the honest services scheme. Ms. Burch also testified that she decided on her own to alter amounts for the price sold of certain options by tenfold to also further the honest services scheme. Her testimony was in exchange for her plea agreement where she pled guilty to one count of conspiracy arising out of the same facts.

Under the conspiracy count, 18 U.S.C. § 371, and 18 U.S.C. § 2, which Mr. Martignoni was charged under for each of the 16 counts, he was held responsible for her actions. As such, the Government successfully argued that the volatilities rates for these options, which a trader subjectively determined, were in fact false. The Government successfully argued that where unrealized options are valued based on the volatility rate and other factors, that this false volatility rate along with false sale price of the option inflated the portfolio's overall value. Significantly, evidence was introduced that ABN-AMRO could have easily and readily valued the portfolio based on its own criteria at anytime. Nonetheless, the Government ultimately convinced the Jury that this scheme as presented in each the 16 counts denied ABN-AMRO of its right to honest services and Mr. Martignoni benefited by his salary, bonus and continued employment. It was the motive that formed the requisite intent for each of the 16 counts.

For the two counts of bank fraud under, 18 U.S.C. §§ 1344, 1346 and 2, this was based only on a scheme to defraud the bank of its intangible right to honest services which was legally flawed as it did not entail any kickbacks or bribes. Under *Skilling v. United States* these counts are for conduct for which 18 U.S.C. § 1346 does not deem criminal, and may readily be set aside.

For the single conspiracy count, it should be vacated as there is a constitutional error because the Jury returned a general verdict and the verdict may rest on a legally invalid theory. *Yates v. United States*, 354 U. S. 298 (1957). The Court instructed the Jury on alternative theories where the object of the conspiracy was to commit false entries of bank records, 18 U.S.C. § 1005 or the legally invalid honest services bank fraud, 18 U.S.C. § 1344 and 18 U.S.C. § 1346. This constitutional error is subject to the harmless-error analysis on review. *Hedgpeth v. Pulido*, 555 U. S. ___ (2008) (*per curiam*).

The Government would be hard-pressed to show that Mr. Martignoni's conspiracy conviction rested only on the false entries theory rather than on the legally flawed honest services theory given the weight of the evidence and the co-conspirator's testimony.  Where the honest services theory was so central to the Government's case and the bulk of the evidence related to it, it is likely this error influenced and swayed the Jury.  Significantly, each of the overt acts listed in the Indictment in ¶¶7(a)-(m) represent the false statements set forth in counts 2-14 of the Indictment, and the remaining overt acts listed in ¶¶7(n)-(t) correspond to the allegations in the two bank fraud counts under the honest services theory (counts 15 and 16).  *Chapman* v. *California*, 386 U.S. 18, 24 (1967) ("whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction."); *Brecht* v. *Abrahamson*, 507 U. S. 619, 623 (1993) ("had substantial and injurious effect or influence in determining the jury's verdict.").  The conspiracy count should be set aside.

Without the honest services fraud charge set forth in the conspiracy and bank fraud charges, the Jury would have to look solely at the issue of false volatility of the options.  It would not have heard any evidence from Ms. Burch, the co-conspirator's regarding her decimal switching of the sold option, and it would not have heard evidence framed in terms of an honest services fraud scheme.  Notably, the Indictment repeats, realleges and incorporates by reference each of the allegations in the Indictment such that each count is built on top of the one preceding it.  Accordingly, with the 13 counts of false entries under 18 U.S.C. §§ 1005 and 2, there are issues as to evidence, including a motive involving a legally flawed theory, and whether Mr. Martignoni could be held responsible for Ms. Burch's acts under 18 U.S.C. § 2 dictate that these counts should be vacated.

In the interest of fairness and when balanced with the harm that this conviction is having for Mr. Martignoni following the completion of his sentence, Mr. Martignoni's entire conviction should be set aside following *Skilling v. United States, supra.*

### C.  Mr. Martignoni Could Not Seek This Type Of Relief Until Now.

Mr. Martignoni commenced this action following the Supreme Court's decision, *Skilling v. United States, supra,* issued on June 24, 2010.  In addition, Mr. Martignoni had requested for the Immigration Court to stay its decision until the ruling of *Skilling v. United States* and two other honest services cases so that Mr. Martignoni could then seek a writ of *coram nobis* from this Court if appropriate.  The Immigration Court rejected this request.  This is not the situation where the petitioner has not shown that this relief was being requested in a timely manner.  *See, e.g., Nicks v. Untied States*, 955 F.2d 161 (2nd Cir. 1992) (petitioner was not entitled to *coram nobis* relief where he could not show why he delayed in asking for such relief); *Foont v. United States*, 93 F.3d 76 (2d Cir.1996) (same).

### D.  Mr. Martignoni Continues To Suffer Serious Consequences From His Conviction.

Although Mr. Martignoni has been a lawful permanent resident since his entry into the United States in 1988 and was incarcerated for "an act that law does not make criminal," he has now been ordered to be removed or deported because of this wrongful conviction.  This is a real consequence of his wrongful conviction for the consequence of deportation is the most severe.[14] "We have long recognized that deportation is a particularly severe 'penalty.'" *Padilla v. Kentucky* 559 U.S. ___ (2010), slip op. 8 (citing *Fong Yue Ting v. United States,* 149 U. S. 698, 740 (1893)).  *INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987) ("[d]eportation is always a harsh measure"); *Costello v. INS*, 376 U.S. 120, 128 (1964) (deportation is a "drastic measure"

---

[14]  *Fleming v. United States*, 146 F.3d 88 (2nd Cir. 1998) (petitioner failed to allege specific and real continuing legal disability from conviction).

where the "stakes are considerable for the individual"); *Delgadillo v. Carmichael*, 332 U. S. 388, 390–391 (1947) (deportation is "the equivalent of banishment or exile"); *Swaby v. Ashcroft*, 357 F.3d 156, 160 (2d Cir. 2004) ("[P]etitioner is no longer imprisoned, but he faces a lifetime bar from reentering the United States as result of having been ordered removed after an aggravated felony conviction. He thereby suffers a 'collateral consequence' [from his conviction]."); *Lok v. INS*, 548 F.2d 37, 39 (2d Cir. 1977) (deportation "in severity surpasses all but the most Draconian criminal penalties"). In addition, this wrongful conviction precludes Mr. Martignoni from seeking naturalization.

Mr. Martignoni has satisfied the three requirements for this Court issuing a *coram nobis* petition. Indeed, courts have granted *coram nobis* petitions in similar circumstances as Mr. Martignoni's where a petitioner is faced with negative immigration consequence of removal/ deportation. *See, e.g., Qiao v. United States*, 07 Civ. 3727 (SHS), 2007 WL 4105813 (S.D.N.Y. November 15, 2007) (court vacated decision for mail fraud under *coram nobis* petition and defendant is no longer ineligible for relief from removal); *United States v. Kwan* 407 F. 3d 1005 (9th Cir. 2005) (coram nobis petition where bank fraud conviction could be set aside because of ineffective assistance of counsel with regard to immigration consequences); *United States v. Khalaf*, 116 F. Supp.2d 210 (D. Mass. 1999) (granted a *coram nobis* petition to set aside drug trafficking offense where the defendant received ineffective assistance of counsel regarding his plea and the immigration consequences, and suffered real consequence from deportation as he was married to a U.S. citizen and had two U.S. citizen children).

## III.    LEGAL CONCLUSION

For all of the above stated reasons, Mr. Martignoni respectfully requests that this Court grant a *coram nobis* petition vacating or setting aside his wrongful conviction, which he already

served, following the ruling of *Skilling v. United States, supra.* By this Court setting aside this conviction of 17 years ago, Mr. Martignoni would not face deportation/removal as he would not be deemed to have committed an "aggravated felony" under Section 1101(a) (43) of the Immigration and Nationality Act, and could remain here as a lawful permanent resident, and seek to become a naturalized Citizen. Though the basic factual and legal arguments are set forth in this petition, Petitioner request a hearing and opportunity for further briefing as may be necessary.

DATED: September 7, 2010
New York, New York

Respectfully submitted
JAMES MARTIGNONI
By his attorney


/s/ Valerie B. Robin
_____

Valerie B. Robin
Law Offices of Valerie B. Robin
60 State Street, Suite 700
Boston, MA  02109
(617) 266 9732
val@robinlawoffices.com

Local Counsel:

/s/ Richard P.Savitt
_____

Richard P. Savitt
Savitt Law Firm PLLC
305 Broadway
Suite 1400
New York, NY 10007
(917) 414-2523
Rsavitt@Savittlawfirm.com

# EXHIBIT A

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
BOSTON, MASSACHUSETTS

**IN THE MATTER OF:**

| | | |
|---|---|---|
| MARTIGNONI, James Philip | ) | **In Removal Proceedings** |
| A 41-623-010 | ) | |
| | ) | |
| Respondent _____ | ) | |

**CHARGES:**   Immigration and Nationality Act (INA) § 212(a)(2)(A)(i)(I) - Alien who has been convicted of a crime involving moral turpitude, or an attempt or conspiracy to commit such a crime.

**APPLICATIONS:**   Cancellation of Removal for Certain Permanent Residents, pursuant to INA § 240A(a);
Waiver of inadmissibility pursuant to INA § 212(c); and
Waiver of inadmissibility pursuant to INA § 212(h).

**ON BEHALF OF RESPONDENT:**
Jeremiah Friedman
Kaplan, O'Sullivan & Friedman, LLP
10 Winthrop Square, 3rd Floor
Boston, MA 02110

**ON BEHALF OF DHS:**
Assistant District Counsel
Trial Attorney Unit–DHS
JFK Federal Building, Room 425
Boston, Massachusetts 02203

## DECISION OF THE IMMIGRATION COURT

The Court will pretermit the Respondent's applications for cancellation of removal under INA § 240A(a) and waiver of inadmissibility under former INA § 212(h) because the Respondent's convictions for bank fraud and conspiracy to commit bank fraud constitute aggravated felonies, thus rendering him ineligible for relief. The Court will pretermit the Respondent's application for a waiver of inadmissibility under former INA § 212(c) because he was not convicted pursuant to a plea agreement.

## I.   PROCEDURAL HISTORY

On September 9, 2008, the Department of Homeland Security (DHS) personally served a Notice to Appear (NTA) on the Respondent, James Philip Martignoni, alleging that he is a native and citizen of Australia, who has been a lawful permanent residence since September 21, 1988. *See* Notice to Appear. DHS further alleged that on March 15, 1994, the Respondent was convicted in the United States District Court for the Southern District of New York at New York, NY, for the

following offenses: (1) Conspiracy to Commit Bank Fraud, in violation of Title 18 USC § 371; (2) thirteen counts of False Entries in Bank Records, in violation of Title 18 USC § 1005; (3) and two counts of Bank Fraud, in violation of Title 18 USC §§ 1344 and 1346. *Id.* DHS further alleged that on July 19, 2008, the Respondent applied for admission to the United States as a returning lawful permanent resident in New York, NY. *Id.* Based on this information, DHS charged the Respondent with inadmissibility pursuant to INA § 212(a)(2)(A)(i)(I), as an alien who has been convicted of a crime involving moral turpitude. *Id.*

At a hearing before the Boston Immigration Court (Court) on October 28, 2008, the Respondent, through counsel, submitted written pleadings, admitting his alienage and citizenship and admitting that he has been a LPR since 1988. He denied his March 15, 1994, convictions, and further denied removability as charged. He identified Cancellation of Removal pursuant to INA § 240A(a), a waiver of inadmissibility pursuant to INA § 212(h), and a waiver of inadmissibility pursuant to INA § 212(c) as relief for which he intended to apply. At a subsequent hearing on January 9, 2009, the Respondent, through counsel, orally amended his pleadings, admitting his convictions for bank fraud, further admitting that those convictions were crimes involving moral turpitude, and conceding removability as charged in the NTA.

On February 23, 2009, DHS submitted a motion to pretermit the Respondent's applications for cancellation of removal and waivers of inadmissibility on the grounds that he is an aggravated felon and therefore ineligible for those forms of relief. Specifically, DHS asserted that the Respondent's March 15, 1994, convictions constitute aggravated felonies as defined in INA § 101(a)(43)(M)(i), specifically offenses that involve fraud or deceit in which the loss to the victim exceeds $10,000. DHS further asserted that the Respondent's conspiracy conviction constituted an aggravated felony as defined in INA § 101(a)(43)(U), as a conviction for an attempt or conspiracy to commit an offense involving fraud or deceit in which the loss to the victim exceeds $10,000.

The Respondent submitted three briefs in support of relief from removal, and DHS submitted a supplemental brief in support of its motion to pretermit. In their briefs, both parties addressed the U.S. Supreme Court's recent decision *Nijhawan v. Holder*, 129 S.Ct. 2294 (2009), concerning how to analyze INA § 101(a)(43)(M)(i).

## II.   STANDARDS OF LAW

### A.   Aggravated Felony, Offense Involving Fraud or Deceit in Which the Loss to the Victim Exceeds $10,000

In relevant part, an aggravated felony is defined as an offense that involves fraud or deceit in which the loss to the victim or victims exceeds $10,000. INA § 101(a)(43)(M)(i). The U.S. Supreme Court recently held that in determining whether an offense falls under INA § 101(a)(43)(M)(i), a 'circumstance-specific' rather than a 'categorical' or 'modified categorical' approach is warranted. *Nijhawan v. Holder*, 129 S.Ct. at 2300, 2303. The Court held that "the monetary threshold [in INA § 101(a)(43)(M)(i)] applies to the specific circumstances surrounding an

2

offender's commission of a fraud and deceit crime on a specific occasion," and that an immigration court may look beyond the record of conviction, including to earlier sentencing-related material, to determine the amount of loss. *Id.*

**B.      Cancellation of Removal for Certain Lawful Permanent Residents**

INA § 240A(a) provides that a lawful permanent resident is eligible for cancellation of removal if he or she: (1) has been lawfully admitted for permanent residence for not less than five years; (2) has resided in the United States continuously for seven years after having been admitted in any status; and (3) has not been convicted of an aggravated felony.

**C.      Waiver of Inadmissibility under Former INA § 212(c)**

To be eligible for section 212(c) relief, an individual placed in proceedings after April 24, 1996, must have entered a plea agreement prior to April 1, 1997, when section 212(c) was effectively repealed by IIRIRA. *INS v. St. Cyr*, 533 U.S. 289, 326 (2001). An alien also must have maintained lawful, unrelinquished domicile in the United States for a period of seven consecutive years. INA § 212(c) (1995).

An alien who has been convicted of an aggravated felony is ineligible to seek relief under section 212(c), except as provided in 8 C.F.R. § 1212.3(f)(4). Specifically, an alien is eligible to apply for a waiver under INA § 212(c) if he was convicted of an aggravated felony pursuant to a plea agreement made before November 29, 1990. 8 C.F.R. § 1212.3(f)(4). Similarly, an alien who has been convicted of an aggravated felony pursuant to a plea agreement made on or after November 29, 1990, but prior to April 24, 1996, is also eligible to apply for § 212(c) relief if he did not serve a term of imprisonment of five years or more for that conviction. 8 C.F.R. § 1212.3(f)(4).

**D.      Waiver of Inadmissibility pursuant to INA § 212(h)**

In relevant part, INA § 212(h) provides that certain grounds of inadmissibility under section 212(a)(2)(A)(i)(I)-(II), (B), (D)-(E) of the Act may be waived in the case of an alien who demonstrates that his removal from the United States would result in extreme hardship to his United States citizen or lawful resident parent, spouse, son, or daughter. INA § 212(h)(1)(B). A 212(h) waiver is not available to an alien who has previously been admitted for permanent residence if since the date of such admission, the alien has been convicted of an aggravated felony. INA § 212(h)(2).

## III.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

Based on the Respondent's admissions and the record of conviction, the Court finds that removability has been established by clear and convincing evidence.

A.   **Respondent's Convictions for Bank Fraud in violation of 18 USC §§ 1344 and 1346 and Conspiracy to Commit Bank Fraud in violation of 18 USC § 371 are Aggravated Felonies**

The record contains a judgment sheet from the United States District Court for the Southern District of New York, dated March 15, 1994, indicating that the Respondent was found guilty of one count of conspiracy to commit bank fraud in violation of 18 USC § 371, thirteen counts of false entries in bank records in violation of 18 USC § 1005, and two counts of bank fraud in violation of 18 USC §§ 1344 and 1346. Exhibit 3. He was sentenced to twenty-one months imprisonment followed by three years of supervised release. *Id.* The judgment indicates that the fine range for his sentence was between $15,000 and $15,000,000, but that the fine was waived because of the Respondent's inability to pay. *Id.*

The First Circuit has held that an offense under 18 USC § 1344 involves fraud or deceit. *Conteh v. Gonzales*, 461 F.3d 45, 59 (1st Cir. 2006). Thus, if the Respondent's bank fraud conviction in violation of 18 USC § 1344 involved a loss to the victim in excess of $10,000, then his conviction is an aggravated felony. It follows that if the Respondent's bank fraud offense in violation of 18 USC § 1344 involved a loss to the victim in excess of $10,000, then his conviction for conspiracy to commit bank fraud is also an aggravated felony. *Id.* Moreover, the Respondent's conviction for conspiracy, standing alone, is an aggravated felony if the substantive crime that was the object of the conspiracy was an offense that involved "fraud or deceit" and where the potential loss to the victim or victims exceeded $10,000. *Matter of S-I-K-*, 24 I&N Dec. 324 (BIA 2007).

The Court finds that the evidence establishes that the loss to the victim exceeded $10,000. Along with its most recent brief filed with the Court on March 5, 2010, DHS submitted a transcript of the sentencing hearing from the Respondent's criminal trial in the U.S. District Court for the Southern District of New York, dated March 15, 1994. In the transcript, the Judge stated that "Mr. Martignoni's salary and bonus of an amount between 200,000 and 350,000 is the appropriate loss to be recognized and calculated in this case for guideline purposes." The District Court then took this loss amount into account in determining the Respondent's sentence.

DHS asserts and the Court agrees that the District Court's loss determination at sentencing constitutes clear and convincing evidence that the Respondent's conviction for bank fraud involved a loss to the victim exceeding $10,000. *See Nijhawan v. Holder*, 129 S.Ct. at 2297. (finding that the immigration judge properly relied upon sentencing-related material in which the petitioner had stipulated that the loss related to his offense exceeded $100 million).

The Respondent asserts that his salary and bonus were not actual losses to the Respondent's then-employer, ABN AMRO bank, because the bank never paid the salary or bonus to the Respondent. Even if the Court were to find that this evidence outweighed the District Court's specific determination that the losses in the case amounted to $200,000 to $350,000, and that accordingly the Respondent's bank fraud conviction was not an aggravated felony, the Respondent's conviction for conspiracy to commit bank fraud would still be an aggravated felony. DHS cited to

4