UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
JAMES MARTIGNONI,           :
            :
          Petitioner,     :
            :
    - v. -         :           10 Civ. 6671 (JFK)
            :
UNITED STATES OF AMERICA,  :
            :
          Defendant.    :
-------------------------------------------------------x

# MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
## IN OPPOSITION TO THE PETITIONER'S MOTION FOR *CORAM NOBIS* RELIEF

PREET BHARARA
United States Attorney
Southern District of New York
One St. Andrews Plaza
New York, New York 10007

JONATHAN COHEN
Assistant United States Attorney
-Of Counsel-

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ......................................................................................................................2

    I.     The Government's Case at Trial ...............................................................................2

    II.    The Defense Case ...................................................................................................15

ARGUMENT..........................................................................................................................17

    I.     Martignoni Does Not Qualify For *Coram Nobis* Relief Because He Cannot Show That He Continues To Suffer Legal Consequences From His Conviction That May Be Remedied By Granting Of The Writ of *Coram Nobis*...................... 17

    II.    An Independent Basis For Denial Of The Petition Is That Coram Nobis Relief Is Unavailable Where, As Here, The Indictment States A Legally Valid Theory Of Conviction, The Evidence Supported Such Theory, and Such Theory Was Submitted To The Jury……………………………………………...……………… 22

CONCLUSION .....................................................................................................................25

## PRELIMINARY STATEMENT

James Martignoni (the "Petitioner") was convicted on March 15, 1994 in the United States District Court for the Southern District of New York, following a three-week trial before the Honorable John F. Keenan, United States District Judge, and a jury.  Indictment 92 Cr. 1097 (JFK) (the "Indictment")[1] was filed on December 10, 1992, in 16 counts.  Count One charged Martignoni with conspiring to cause false entries to be made in bank records and to commit bank fraud, in violation of Title 18, United States Code, Section 371.  Counts Two through Fourteen charged Martignoni with fraudulently causing false entries to be made in bank records, in violation of Title 18, United States Code, Section 1005.  Counts Fifteen and Sixteen charged Martignoni with bank fraud, in violation of Title 18, United States Code, Section 1344.

Trial commenced on October 19, 1993 and ended on November 9, 1993, when Martignoni was convicted on all counts.  On November 30, 1993, Martignoni filed a motion for a new trial or judgment of acquittal.  The District Court denied his motion in a written opinion on February 17, 1994.  On March 15, 1994, Judge Keenan sentenced Martignoni to a term of 21 months' imprisonment, to be followed by a term of three years of supervised release, and imposed the mandatory $800 special assessment.

Martignoni filed a direct appeal, arguing (1) the evidence was insufficient to support his convictions; (2) Judge Keenan erred in giving the jury a conscious avoidance instruction; and (3) that the statutory definition of a "scheme or artifice to defraud" to include a scheme to deprive another of "the intangible right of honest services," see 18 U.S.C. § 1346, is unconstitutionally vague.  On September 19, 1995, the Second Circuit Court of Appeals found these arguments to be without merit and affirmed the judgment.[2]

On September 7, 2010 Martignoni filed a petition for writ of coram nobis in an attempt to vacate his 1994 convictions.  In that Petition, Martignoni argues (1) that he is not barred from coram nobis relief because his conspiracy conviction was deemed an "aggravated felony" by "[a]n immigration court . . . and this finding bars him virtually from all relief against this deportation . . ."  (Pet. 2.); and (2) that due to the United States Supreme Court's decision in Skilling v. United States, 130 S. Ct. 2896 (2010), Martignoni's convictions should be vacated

---

[1] The Indictment is attached hereto as Exhibit A.

[2] The Second Circuit's opinion is attached hereto as Exhibit B.

(Pet. 1). The Government respectfully submits that the Petition should be dismissed in its entirety because (1) Martignoni cannot make the required showing that he "continues to suffer legal consequences from his conviction that may be remedied by granting of the writ [of coram nobis]," Foont v. United States, 93 F.3d 76, 79 (2d Cir. 1996), because Skilling leaves undisturbed Martignoni's 13 counts of conviction for making false entries in bank records, 18 U.S.C. § 1005, and those counts constitute "aggravated felonies" that are an independent basis for deportation; and (2) an independent ground for denial is that, under the relevant caselaw, coram nobis relief is unavailable where, as here, the Indictment stated a legally valid theory of conviction, the evidence supported such theory, and that theory was submitted to the jury.

## BACKGROUND

### I.    The Government's Case at Trial

The Government's proof at trial amply established that during 1991 James Martignoni, a foreign exchange options trader, defrauded his employer, ABN-AMRO Bank, N.V. ("ABN"), by falsely inflating the value of Martignoni's options portfolio in order to offset losses – in the end totaling approximately $70 million – that Martignoni had incurred through trading foreign currency. In daily reports he was required to submit to ABN, Martignoni falsely increased the volatility (a principal determinant of value) for certain options in his portfolio, which in turn increased the reported value of the options, sometimes by more than 2000% on the same day that Martignoni had purchased them. In December 1991, as ABN's accountants and Martignoni's superiors became increasingly suspicious of his options valuations, Martignoni and Kristen Burch, his trading assistant, took further measures to falsely inflate the value of Martignoni's options portfolio. They manipulated factors in addition to volatility and repeatedly lied to the bank about what they were doing. Burch doctored trading tickets to make it appear that the bank had sold options for ten times the amount of the actual sale prices and then, at Martignoni's urging, tried to convince an ABN back-office clerk to falsely confirm for the bank's accountants that the doctored tickets were accurate.

The Government's witnesses included accomplice Burch,[3] Martignoni's immediate supervisor, ABN's chief foreign currency trader, an ABN accountant, the back-office clerk whom

---

[3] On November 25, 1992, Burch pleaded guilty, pursuant to a cooperation agreement with the Government, to a separate Information, 92 Cr. 966 (JSM), charging her with conspiracy to falsify bank records and commit bank fraud in

Martignoni and Burch tried to enlist in their cover-up, a friend of Martignoni to whom he had made incriminating statements when the fraud was coming to light, and a bank examiner whose review and analysis of trading records showed that by the time the fraud was discovered, Martignoni had substantially exaggerated the volatilities of more than 40% of the options in his portfolio. The physical evidence included bank records and documents and 31 tape recordings of conversations between Martignoni and Burch during the course of the fraud.

### A.     ABN's Operations

#### 1.     ABN's Foreign Exchange Options Desk

In November 1990, ABN hired Martignoni as a Vice President to trade foreign exchange options in its New York branch. (Tr. 643-47).[4] A foreign exchange option is an agreement either to buy ("call") or sell ("put") a certain amount of a foreign currency at a specified exchange rate on a specified future date. (Tr. 58, 851-52). Martignoni's starting salary at ABN was $110,000 plus an annual bonus in the range of 5% to 12% of any profits Martignoni generated. (Tr. 649, 744).

Kristen Burch, who had worked at ABN since July 1988 in both the back office and on the options desk, was Martignoni's assistant trader, primarily responsible for administrative support. (Tr. 56, 62-68). When necessary, Burch did small amounts of trading herself. (Tr. 63, 165). During the relevant period, the options desk consisted of Martignoni and Burch.[5]

Martignoni's immediate supervisor at ABN was Michael Guarino, head of ABN's foreign exchange trading department in New York. During two job interviews, Martignoni assured Guarino that he fit in with the bank's risk-averse trading profile. (Tr. 642-45). Guarino and other currency traders worked in a trading room in the New York office. (Tr. 79-84). Guarino sat near Martignoni and asked Martignoni about his positions throughout the day. (Tr. 83; 668-70). At the end of each day, he also asked Martignoni for an oral estimate of the day's "P&L," profit and loss. (Tr. 245-46). To minimize risk, Martignoni was required to trade foreign currencies against his options positions, a risk-minimizing strategy known as "hedging" or "delta

---

connection with the fraudulent inflation of volatilities and the value of Martignoni's foreign exchange options portfolio. On June 2, 1994, Burch was sentenced to a term of 2 years' probation.

[4] "Tr." refers to the trial transcript; "GX" refers to the Government's trial exhibits; and "Pet." refers to Martignoni's Petition for a writ of coram nobis.

[5] A junior trader, Antonio Scali, was hired in November 1991. Scali had no involvement with the trades at issue in the case. (Tr. 247).

hedging." (Tr. 62, 668-69).[6]  When he hired Martignoni, Guarino set trading limits of $10 million overnight and $20 million "daylight" (intra-day) on the amount of unhedged currency exposure that Martignoni could have outstanding.  (Tr. 121-22, 659-61, 863).[7]

ABN required Martignoni and Burch to prepare and submit daily information to ABN's Accounting and Treasury Administration departments (the "back office") concerning the value of the options and foreign currency in Martignoni's portfolio.  ABN determined the value (that is, the estimated market price) of the options positions using a mathematical formula based on five primary variables: (i) the "strike price," which is the price at which an option may be executed on its future expiration date; (ii) the "spot," that is, the exchange rate between the two currencies; (iii) the amount of time left until the option expires (also referred to as its maturity or execution date); (iv) the relative interest rates in the countries of the two currencies involved in the option; and (v) the "volatility," a measure of the relative degree of fluctuation of the currencies.  (Tr. 59-61, 851-53).  A more volatile currency shows more movement up and down, and is therefore considered more likely to hit a given strike price; a less volatile currency is considered less likely to do so.  Accordingly, the higher the volatility level, the higher the value of the option.  (Tr. 427-30, 809, 878).

Two of the variables used to determine value -- strike price and maturity date -- were set by the trade itself.  Two other variables -- exchange rate and interest rate -- were readily accessible market figures.  (Tr. 871-72).  The final variable -- volatility -- was published only for a narrow range of options struck at prices close to "at-the-money" options -- that is, those with strike prices at or near the then-current exchange rate.  (Tr. 871).  ABN's accountants obtained exchange rates, interest rates and volatilities from the trader at the end of each day.  (Tr. 437, 491).  They used the published Federal Reserve volatility survey to verify at-the-money volatilities at the end of each month.  (Tr. 442, 446-48).  For farther ("deep") "out-of-the-money" options, that is options in which the strike price was farther away from the current exchange rate,[8] volatility figures were not published, and ABN relied on Martignoni's volatilities, which

---

[6] The amount of foreign currency traded in order to hedge a particular option was determined by the option's "delta" -- a measure of the likelihood that the exchange rate would reach the strike price of the option by the date of the option's exercise. Thus, a $10 million option with a 50 delta would be hedged with a $5 million currency sale.  (Tr. 127, 428, 667-68).  The higher an option's volatility, the higher the delta, and therefore, the bigger the currency position required to be held as a hedge.  (Tr. 888-89).

[7] Burch recalled Martignoni's daytime limit to be $30 million by June 1991.  (Tr. 121-23).

[8] An "out-of-the-money" call option has a strike price higher than the current exchange rate.  It would not be currently exercised, because it would be cheaper to buy the currency in the market than by exercising the option.  An "in-the-money" call

he and Burch input, printed out on a computer, and gave to the back office. (Tr. 97-98, 439, 441-42, 447-48).

The volatilities for Martignoni's out-of-the-money options should have been slightly greater, but generally no more than 3-1/2% greater, than those published for at-the-money options in the same currency.[9]  (Tr. 866).  Even such a large differential occurs only infrequently and for very short-term options; the longer the term of an option, the smaller the difference becomes, until the volatility for the longest-term out-of-the-money option approaches the at-the-money volatility level.  (Tr. 866).

### 2.     The Bank's Use Of Martignoni's Volatility Figures In Valuing His Options Positions
#### (i)     The "FENICS" Generated Records

Martignoni and Burch worked on a computer located at their desk, using a program known as FENICS, to generate the options valuation reports and trade data they were required to submit to the back office at the end of every day.  For the Treasury Administration department, they printed volatility grids, or matrices, showing the end-of-day range of volatilities for options at different strike prices, using figures input by Martignoni and Burch  (Tr. 72-77, 92, 368, 436-39, 830-32), as well as a trade ticket for each option trade.  (Tr. 85-88).  They also used FENICS to generate the "revaluation report" they provided each day to the Accounting Department; this report was a chronological listing of all options, setting forth all relevant pricing data for each option as of the close of the day, including Martignoni's assigned volatility.  (Tr. 89-92, 368; GX 10, 10A, 62-65; A. 71-93).  For each currency trade, Burch handwrote a "spot ticket," reflecting the counterparty and the terms of the trade.  (Tr. 127-28).

#### (ii)     The P&L Estimates

At the end of each business day, the trading desk also reported how much money the options desk had lost or profited on its trades that day (the "P&L"). (Tr. 67-72).  Burch prepared the P&L figure to provide to the back office based on the market value of the options positions as reflected on the revaluation report and the spot prices for the currency positions. (Tr. 118-19; 244-45; 410-12).  Martignoni would give a similar daily oral P&L estimate to Guarino, his

---

option is currently exercisable because its strike price is lower than the spot rate, making it cheaper to obtain the currency by exercising the option than by buying the currency in the market.  (Tr. 97-98).

[9] Antonio Marfia, the Director of Foreign Exchange Examinations for the New York State Banking Department, testified that, in his experience, volatilities for out-of-the-money options were at most 3.5 points higher than those for at-the-money options. (Tr. 866).  Burch similarly testified that volatilities for out-of-the-money options "varied slightly," but were virtually always within 2% to 4%, of those for at-the-money options. (Tr. 364; 420-22).

immediate supervisor. (Tr. 244-45; 664-66).  Guarino understood this P&L to represent the traders' net profitability, valuing both the options and the currency "at market" or "marked to market" -- valued at the level at which they could be sold in the market -- at the end of each day. (Tr. 666, 795-96).

### (iii)  The "TUFFS" Generated Records

After ABN's back office received the trade tickets and volatility matrices from Martignoni's desk, a back-office clerk input the data from them into ABN's "TUFFS" computer, which generated its own revaluation reports and volatility matrices.  (Tr. 485-89; GX 10A; SA 17).  Because the FENICS and TUFFS valuation programs were slightly different, the input of Martignoni's volatilities and other factors sometimes resulted in marginally different P&L calculations.  The Accounting Department reconciled the TUFFS reports with the corresponding FENICS reports; if a discrepancy exceeded a few thousand dollars, the accountants would go to Martignoni for an explanation.  (Tr. 76-79, 98-99, 440-41, 620-21).  The P&L computed by TUFFS was then downloaded into the bank's mainframe computer, known as the MTI system, to become part of the bank's general ledger. (GX 10A; SA 17).  Thus, the content of ABN's official books and records derived directly from Martignoni's input into the FENICS program -- including the volatilities set forth on Martignoni's volatility grids.  (Tr. 439-42, 617; GX 10A).

### B.    The Fraud

### 1.    Martignoni's Falsely Inflated Out-Of-The-Money Volatility Figures

In September 1991, Martignoni began asking Burch to run FENICS revaluation reports during the course of the day, using at-the-money volatility figures for his out-of-the-money options so that he could "see what it looked like".  (Tr. 101-07).  Burch recognized that revaluing the options using at-the-money volatilities would provide an estimate of the market value of the portfolio since out-of-the-money options had volatilities slightly higher, but generally no more than about 2% to 4% higher, than those of at-the-money options.  (Tr. 109-11, 364, 421-22). Accordingly, by revaluing the portfolio using at-the-money volatilities, Martignoni would obtain an estimate, within a few percent, of the market value of his portfolio.[10]

The first time that Burch ran this calculation, it resulted in a loss of approximately $20 million in the P&L.  (Tr. 102-03).  When she told Martignoni of the $20 million loss that was

---

[10] Even the defendant's expert agreed that this type of calculation provides a "rough ballpark estimate" of the portfolio's market value. (Tr. 1114).

revealed, he instructed her not to tell anyone because "a lot of people would lose their jobs" if ABN found out about a loss that high. (Tr. 102-03). In compliance with Martignoni's directive, Burch threw out the FENICS revaluation report using at-the-money volatilities and instead submitted one to the back office based on Martignoni's higher out-of-the-money volatility figures, which disguised the substantial loss in the options desk's P&L. (Tr. 104).

Throughout the fall of 1991, Martignoni continued --with Burch's knowledge and assistance -- to supply the bank with numerous inflated out-of-the-money volatilities, mostly in Deutsche Marks and Dutch Guilders. (Tr. 110-11, 866). At Martignoni's request, during each trading day, Burch ran FENICS revaluation reports for Martignoni using at-the-money volatility figures for all options, including out-of-the-money options (the "intra-day reports"), threw out those reports, then input into FENICS Martignoni's inflated out-of-the-money volatility figures for the reports submitted to the back office (the "inflated reports"). (Tr. 104-07). When Guarino asked for an oral report of the day's P&L, Martignoni gave him a figure based on what he expected that the inflated report would show; he never mentioned to Guarino anything about the substantial losses revealed by the intra-day reports.[11] (Tr. 244-46, 665-66). The inflated reports often contained options with volatilities marked in the range of 20 to 29 percent, which was 8 to 17 points higher than the market rates of approximately 12 percent. This resulted in fictitious profits on those positions in the portfolio, often in the hundreds of thousands or millions of dollars. (Tr. 147-52). As the year wore on, Martignoni bought increasing numbers of out-of-the-money options. (Tr. 449, 616).

In October 1991, Michael Geslak, Assistant Vice President in charge of financial reporting for ABN's Treasury Division, which included the foreign exchange department and options desk, noticed that Martignoni had purchased options in late September 1991 that were promptly being revalued at several times their original value. (Tr. 451). When Geslak asked about them, Martignoni assured him and Guarino that the valuation of his portfolio "was fine," explaining, as he had when Geslak questioned him on prior occasions, that out-of-the-money

---

[11] During the period between September and December 1991, Burch and Martignoni routinely engaged in other practices designed to deceive ABN and its officers. Martignoni used a code on his currency trading blotters -- a small asterisk and a decimal point, indicating to him and Burch that a trade was ten times larger than it appeared to be -- so that Guarino, if he walked around the trading floor and looked at the sheets, would not immediately realize the enormity of Martignoni's currency positions. (Tr. 128-32). He and Burch also wrote a small "delta," or recorded the false expiration of an option, to indicate that a currency position had been hedged against an option even though, in fact, the position was just an unhedged cash trade. (Tr. 128-29). Using these methods, Martignoni reduced the likelihood of closer or more immediate scrutiny of his trading by Guarino, who frequently walked around the trading room.

options trade at higher volatilities than at-the-money options. (Tr. 450-53).  What Martignoni failed to say, however, was that the volatilities were marginally higher, but nowhere near the extreme differentials of up to 17 percent that he was reporting.  Clearly demonstrating that he knew that the differential was supposed to reflect market value, Martignoni told Geslak that his volatilities had to be higher for deep out-of-the-money options to reflect the higher price that people would be willing to trade the options for. (Tr. 450).[12]  Accordingly, Martignoni falsely represented to Geslak that his options were valued at a level realistically consistent with market trading, in order to make ABN believe that his revaluation reports reflected reasonable market liquidation values as of the end of the day for each of the options -- which is consistent with standard industry practice. (Tr. 108-09, 368, 666, 795-96, 1143-44).

### 2.      The November 26 and 29, 1991 Transactions

By November 1991, ABN viewed Martignoni as "the star of the [foreign exchange] operation," "the winner," and an "outstanding trader." (Tr. 671).  The bank informed Martignoni that his annual bonus would be $200,000 (Tr. 670), representing 5% of the $4 million in profits that Guarino believed Martignoni had made for the bank that year.[13] (GX 95).  Guarino told Martignoni that they had "a fantastic year" and instructed him to "lighten his portfolio," that is, to leave only a minimal amount of risk on his books, by November 29, 1991, when the senior traders, including Martignoni and Guarino, were scheduled to leave for a week-long business trip to ABN's home office in Amsterdam. (Tr. 144, 686-87).  Guarino told Martignoni that there was no reason to take any undue risk during the time they would be out of the office and that the overall risk remaining in the portfolio should be reduced to $1 to $3 million -- a level that Burch could manage on her own. (Tr. 687).  Martignoni assured Guarino that he was winding down his positions and that there "would be no exposure at all that would be of any consequence to the bottom line of the bank" while he was away. (Tr. 686-87).

Martignoni did close out some of his options positions, as he was instructed.  (Tr. 598-99).  But rather than close out all or almost all of them as Guarino had instructed him to do -- but

---

[12] Martignoni gave Geslak the extreme example that if he used at-the-money volatilities for deep out-of-the-money options, the price would come to zero, but since the seller of such an option would not sell it for free, the volatilities had to be marked higher.  (Tr. 450).  Martignoni had obviously paid substantial sums for his options, generally in the hundreds of thousands of dollars each, so this radical example had no real connection to his portfolio.  Indeed, Martignoni never complained that the FENICS system was undervaluing his options -- and it certainly was not valuing them at zero in the instances where actual volatilities were used.  (See, e.g., GX 62, 63; A. 71-86).

[13] Guarino was prepared to offer Martignoni a bonus as high as $400,000 (Tr. 675), which was also within the range initially proposed.  Martignoni was also going to receive a 20% raise in salary, to $132,000.  (Tr. 674).

which he could not do without disclosing his multi-million dollar losses -- Martignoni took on substantial and risky new options positions.  On November 26 and 29, 1991, Martignoni purchased a total of 13 call options for a total of 1.3 billion British Pounds Sterling (the "13 Sterling call options"), hedged against a short position of 200 million Pounds Sterling[14] -- a risky position which would require significant and continual monitoring to prevent losses or try to turn a profit.[15]  (Tr. 1183-89).   The volatilities for at-the-money Sterling options were approximately 12% on the dates he purchased the 13 Sterling call options, which meant that out-of-the-money volatilities should have been, at most, a few percentage points higher (Tr. 853, 874-75).[16] Instead, Martignoni assigned them volatilities ranging from 20.72% to 29.95%. (GX 65).  By manipulating these volatility figures, Martignoni inflated by approximately tenfold the valuation that the bank assigned to the options.  Martignoni had paid approximately $4.3 million total for the 13 Sterling call options; based on his inflated volatility figures, however,  the FENICS computer valued them at over $44 million.  (Tr. 1209-13; GX 10-B, 65; A. 93; SA 18). Martignoni then left Burch in charge of the portfolio when he flew to Amsterdam on November 29. (Tr. 167-68).

     Guarino became "livid" when he learned from the New York office that Martignoni had purchased the 13 Sterling call options, leaving Burch with sizeable new positions and violating Guarino's instructions to minimize the risks in his portfolio.  (Tr. 689, 692-93).  Guarino immediately ordered Martignoni to sell the options back to the parties from whom Martignoni had purchased them, thereby closing the positions and eliminating any further risks.  (Tr. 170, 688-89).  Martignoni argued against selling the options.  (Tr. 689).  Burch, who knew the options were being carried on Martignoni's books as significantly overvalued, tried to convince Guarino that they should not sell the options, claiming that she would suffer approximately $150,000 in trading losses because the market was "thin."  (Tr. 170-73, 221).  Neither Martignoni nor Burch advised Guarino, or anyone else at ABN, that the Sterling options could be sold for only a fraction of the values reflected on Martignoni's revaluation reports.

---

[14] A currency position can be "short," which indicates the currency is sold, or "long," indicating it is bought.  (Tr. 222-23).

[15] This was conceded even by the defense expert.  (Tr. 1186-89, 1206-07).

[16] The defense expert conceded on cross-examination that the actual volatilities at which Martignoni had purchased these particular out-of-the-money options was between 13 and 13.5%. (Tr. 1231).

After Guarino ordered the sale of the Sterling options, Martignoni instructed Burch to sell puts instead of calls (Tr. 171).[17] This would make it more difficult for ABN to understand Martignoni's positions, because the bank would have to compare "apples with oranges" rather than "two oranges." (Tr. 172-73). Burch did so with 5 of the Sterling options, then told Geslak and the back office that it was a mistake. (Tr. 171).

Knowing that Guarino wanted the Sterling options sold, but needing to find other places in the portfolio to hide losses they thought to be approximately $20 to $22 million (Tr. 217), Burch and Martignoni engaged in a series of conversations in which they repeatedly discussed manipulating and changing numerous other inputs into FENICS. Martignoni told Burch to falsify interest rates (Tr. 174, 233-34, 250-52); to mark the Sterling rate at the volatility for Dutch Guilders, rather than that for Sterling; to falsely raise a spot (exchange) rate (Tr. 237); and to give ABN a currency ticket for a fictitious trade (Tr. 276-77).

### 3. The Inflated Premiums On The Bankers Trust Trade Tickets

Burch sold the remaining 8 Sterling call options back to the sellers on December 3. With respect to the 6 options she sold back to Bankers Trust, Burch moved decimal points on the trade tickets she gave to the back office, making the sales price on the tickets approximately $18 million, rather than the actual price of $1.8 million. (Tr. 175-79).

In a recorded conversation on December 3, Burch told Martignoni that she had moved the decimal point on the tickets showing the sales of the 6 Sterling options to Bankers Trust and they discussed what other variables they could manipulate when that false entry was eventually uncovered:

BURCH:    [W]hat I did was I put the de--, I moved the decimal place on these premiums with Bankers [Trust], but they're going to find that tomorrow. . . .I don't know what to do, James. . . . There's a 20 million dollar loss.

MARTIGNONI:    Well why don't you just do what I told you to... with the long-end interest rates...
And you've got the Sterling up there, it, that Sterling should cover it...

---

[17] Various references to this direction were tape-recorded. The tapes were made by ABN's New York trading room recorder, set up to record conversations over most telephone lines in the trading room as a record of the transactions. Although Burch repeatedly took the precaution of placing the telephone "on private," that simply prevented others at ABN from hearing the conversation on extension phones; it did not stop the automatic recording system. (Tr. 197-99).

MARTIGNONI:      This [phone] on private?

BURCH:            You'd better believe it's on private.

                               [***]

                  It's down twenty-two [million dollars] . . . Which is what I
                  expected when I moved the Sterling vol[atilitie]s down.  I told you
                  it would be down about twenty-two [million]. Do you want me to
                  move Canada up a bit?... [ABN and its officers are] not even
                  looking at that.

MARTIGNONI:      No, that's not going to be enough... Um, those Sterling options that
                  we did [today,] what are they showing, higher losses?

BURCH:            Well, not with... my creative inputting...
                  [T]hat's going to have to show up tomorrow... Someone's going to
                  say... you put the premium in wrong... I figure [the back office is]
                  not going to check out with [Bankers Trust] tonight if I wait long
                  enough...
                               [* * *]

MARTIGNONI:      Don't worry.  Just relax.

BURCH:            I can't relax... If I lose my job, I don't have any money, I don't have
                  anything.

MARTIGNONI:      Kristen, I'll give you money, don't worry about that... I've got
                  money for you, alright?  I told you I've got fifty grand for, I've
                  already got the money for you... Don't cry.  Please compose your --
                  if they come and see you crying, they'll know something's wrong...

                               [***]

BURCH:                 Um, do you know what I'm going to do? I'm going to say
                  shoot, I screwed these up on the decimal points, on the Sterling, or
                  I'm just going to have to misinput something or something, I don't
                  know... I'm going to have to misinput a trade somehow in a
                  different currency.  What if I misinput a Mark trade?

MARTIGNONI:      No.  Misinput a Sterling one.  Can you do that?... Put in like a, put
                  in like a wrong premium.

(GX 115; Tr. 250-58).

In an attempt to delay the discovery by Geslak and Guarino that the selling prices (premiums) on the trading tickets were fabricated, Burch told Carolyn Melendez, a 20 year-old, back-office clerk who was responsible for confirming the terms of each of Martignoni's trade tickets with the counterparty on the trade, that she did not have to confirm the sales with Bankers Trust because Burch had already done so. (Tr. 179, 815-17, 822, 827-29). Melendez called Bankers Trust anyway and found a discrepancy in that the premiums were different by one decimal place. (Tr. 823).

On December 4, Guarino found out that ABN was claiming it had sold the 6 Sterling call options the day before for approximately $18 million, while Bankers Trust was claiming it had paid only $1.8 million. (Tr. 694-97). Guarino advised Martignoni, who said there must be a mistake and he would call Burch to rectify it. (Tr. 697). Guarino then called an options broker and found out that Bankers Trust was correct about the prices. (Tr. 698-99). Guarino confronted Burch, who told him to talk to Martignoni. (Tr. 699). Burch then called Martignoni in Amsterdam to tell him they were "screwed" and that Guarino was flying home to fire her. (GX 124; A.230). Minutes later, in Guarino's presence, Martignoni called Burch and expressed feigned outrage at the fact that Burch had "miscalculated the premiums;" he disingenuously directed her to straighten things out.

Approximately a half-hour later, Martignoni called Burch and instructed her to try to convince Melendez to tell her superiors that Bankers Trust had called back to say they were incorrect and that the sale was in fact for $18 million:

| | |
|---|---|
| MARTIGNONI: | Did you talk to her? |
| BURCH: | I haven't talked to her yet. I'm going to hold off on this as long as possible. |
| MARTIGNONI: | Kristen, you know what you have to do? |
| BURCH: | No. ... |
| MARTIGNONI: | Is this [phone] on private? |
| BURCH: | Yes. |
| MARTIGNONI: | You have to talk to her and tell her ... our premiums agreed... There's a reason ... The ones we did with Bankers.... All of a |

sudden they rang back and said they're incorrect .... Ask her if she can say that.

BURCH:                    You really need her to do that?

MARTIGNONI:         Of course we do, that's the only way out...

BURCH:                         Wait, wait.  If I tell Carolyn, ["]please call Michael Geslak and say that Bankers called back and that we're correct.["]  And then I say, ["]and when Bankers calls, just agree to what they have.["] ... [S]he's going to want to know why.

MARTIGNONI:         Cause, because we got a problem and we need a day or two to sort it out, and that she won't get involved in it at all, alright... Ask her to do a favor.  Just do that, alright?

BURCH:                    Alright, I will do my best.

(GX 128).

Burch immediately called Melendez and asked her to lie to Geslak, by saying that Bankers Trust had confirmed its options purchases at the prices reflected on ABN's sales tickets (the $18 million rather than the $1.8 million), promising to "fix it" for Melendez the next day so that she would not get into any "hot water." (Tr. 179, 815-17, 822, 827-29). Burch then promptly called Martignoni back to say "it's done." (GX 129).  Martignoni wanted to know if Burch had told Melendez "it's going to mean everyone's job." (GX 129).

Although Melendez initially told Burch that she would lie to Geslak about the confirmation, she promptly decided not to. (Tr. 828; GX 129).

## C.    The Scheme Unravels

By the evening of December 4, Guarino was aware from the back office and his call to an options broker that ABN had sold the Bankers Trust options for only about 10% of the $18 million at which they had been valued.  (Tr. 694-97).  Since he had thought Martignoni's P&L showed approximately $4 million in profits for the year (Tr. 670), Guarino now believed that there was a loss of at least $14 million in Martignoni's portfolio.  (Tr. 700).  Unsatisfied with Martignoni's and Burch's excuses and now desperately needing to know the scope of the problems in Martignoni's portfolio, Guarino cut the Amsterdam business trip short to fly back to New York on the morning of December 5.  (Tr. 700-01).  Guarino and two other senior traders

questioned Martignoni all night about how his portfolio could be showing such a loss. Martignoni insisted that "he didn't know what the problem was" and that it must be an input or computer error. (Tr. 697, 701-04, 999). Gaurino pleaded with Martignoni to tell him anything he knew about the loss. (Tr. 703-04). Martignoni simply replied that "there had to be something wrong in the options book, a ticket put in incorrectly, something that would show the loss that it did." (Tr. 703-04).

On December 5, Guarino flew back on the plane with Martignoni and spoke to him only once, again asking if he could "think of anything" that went wrong; Martignoni said that he could not. (Tr. 704). When they got to New York, they went directly to ABN's offices, where they joined Geslak and other accountants, back-office reconciliation people, and traders who were meeting in an ABN conference room to comb through Martignoni's records in an effort to find the errors that Martignoni claimed must have caused the losses and discrepancies. (Tr. 704-06). In the midst of this "aggressive" search for mistakes, at 3:00 a.m. on December 5, Martignoni motioned to Gaurino that he was going outside for a cigarette. (Tr. 706-07). Martignoni did not return, however, and called Guarino from Boston a day or two later to explain that he had left because was been tired. (Tr. 706-07). Although he consented to Guarino's request that he come back to help in the ongoing search for errors, he never did. (Tr. 706-08). Instead, Guarino next heard from Martignoni's lawyer and never saw Martignoni again until the trial. (Tr. 706-08).

### D.   Martignoni's Admissions To A Friend

On Friday, December 6, 1991 -- while Guarino and ABN's accountants were still in the conference room trying to find errors in the portfolio (Tr. 706-08), and before ABN understood that Martignoni's increased volatilities were the source of the overvaluation problems -- Martignoni admitted to Phil Mastrandrea, his friend and primary options broker, that he had inflated his volatilities. Martignoni told Mastrandrea that he had "big problems" because he had "marked" his volatilities "high" and that ABN had "found out". (Tr. 805). A few weeks later, Martignoni again told Mastrandrea that he had inflated his volatilities. (Tr. 805-08).

### E.   ABN's $70 Million Loss From Martignoni's Fraud

After the fraud was uncovered, ABN revalued Martignoni's options portfolio, using the values and at-the-money volatilities applicable for the last trading day of each month in 1991. In doing so, ABN discovered that Martignoni had overvalued his options portfolio by approximately $50 million.

14

ABN's accountants charted the P&L for the end of each month during 1991, comparing the figures "as originally reported" by Martignoni with "adjusted" figures using at-the-money volatilities as a benchmark. (GX 95). The revalued options were then netted against Martignoni's undisputed currency trading losses, which reached approximately $108 million by November. (Tr. 471-74; GX 95). This analysis revealed that Martignoni had originally valued his options portfolio, as of November 29, 1991, at approximately $112,714,093; net of currency losses and brokerage commissions, the options desk's P&L appeared to be a gain of approximately $2,875,642. (GX 95, page 1, bottom). Using at-the-money volatilities, the options were worth only $59,643,494; thus, net of currency losses and brokerage commissions, Martignoni's cumulative P&L through November 29, 1991, was a loss of approximately $50,194,957 (GX 95, page 2, bottom). In trading to unwind the substantial Sterling currency positions Martignoni and Burch took as hedges against their inflated options, ABN incurred additional losses of approximately $20 million in December 1991. (Tr. 471-74; GX 95).

That ABN had lost more than $50 million as of the end of November 1991 was an estimate also arrived at by Antonio Marfia, Director of Foreign Exchange Examinations for the New York State Banking Department. Marfia revalued the Sterling options that Martignoni had purchased on November 26 and 29, 1991, using published pricing variables including at-the-money volatilities. (Tr. 872). Marfia determined that Martignoni's exaggerated volatilities had overvalued those options on his FENICS reports by approximately $38,122,991. As of November 29, 1991, Marfia calculated that the effect of Martignoni's overvaluations was to inflate his P&L by approximately $51.8 million. (Tr. 967-968).

## II.   The Defense Case

The defendant did not testify, but called one witness, Ezra Zask, in an attempt to establish (1) that ABN was negligent in relying on Martignoni's valuations without verifying them with outside sources; and (2) to opine that Martignoni must have been submitting subjective, "expected" volatilities -- his forecasts or guesses -- to ABN's back office. Zask testified that marking the portfolio to market using "implied" or market-level volatilities is the responsibility

of the back-office, the bank's "bean counter," but is not a concept that applies to a trader. (Tr. 1059-65).[18]

Zask's opinion that Martignoni was reporting "expected" volatilities was not supported by an explanation of any conceivable theory or basis Martignoni used in arriving at his exceedingly high valuations. To the contrary, Zask conceded on cross-examination that he had "no idea" what Martignoni could have been "thinking about" in coming up with the Sterling volatilities he recorded on FENICS on November 26 and 29, 1991, which resulted in option valuations of 1500% to 2200% higher -- translating into $40 million in apparent profit -- above the prices Martignoni had just paid for the options. (Tr. 1209-11). Zask confirmed that when a trader buys or sells an option, he knows the volatility at which it traded. (Tr. 1180). Zask also conceded on cross-examination that a substantial Sterling position such as the $1.3 billion in Sterling calls against a $200 million hedge that was taken by Martignoni at the end of November 1991 -- right before his planned month-long trip abroad -- would require a significant amount of monitoring and attention if it was to be profitable. (Tr. 1186-89).

Zask testified on direct examination that there were a number of different formulas that could be used to determine volatility. During a voir dire relating to the charts, Zask claimed that certain volatility charts he prepared used "the standard formula," but Zask "did not know the formula" or, therefore, the basis on which his own charts were prepared. (Tr. 1071-73).

Zask also testified on direct examination that "10 different banks would give different volatility figures if contacted at the same time." (Tr. 1080). On cross-examination, Zask conceded that the price differences among banks were generally smaller than the transaction costs would be of trading the options. (Tr. 1224-28). The pricing differences among banks are thus insignificant.[19] This comports with the reality, recognized by Zask, that billions or trillions of dollars of currency and currency options trade each day around the world; price differences are not so great that they interfere with these vast markets. (Tr. 1228-29). Zask further conceded that Deutsche Mark and Sterling trades against the dollar are the most heavily traded and liquid in the world options markets (Tr. 1228-29) -- and therefore the most stable and uniformly priced.

---

[18] Zask testified that implied volatilities are the measure implied by the market at a given time; if the other pricing variables (premium, spot, interest rates, time to expiration) are known, the implied volatility can be backed out using a pricing formula. (Tr. 1079-81).

[19] Transaction costs -- brokerage commissions -- are a small fraction of the size of a trade. As a rough estimate, for example, by the end of November, 1991, Martignoni had traded accumulated options positions worth approximately $59,643,494 (based on at-the-money volatilities) and currency positions of ($107,697,843). His total brokerage commissions for that period were $2,009,804 -- approximately 1.2% of the total volume of options and currency he traded. (GX 95, p.2, bottom half).

During his cross-examination, Zask also agreed with the Government that it is "standard industry practice" for traders to be required to submit a reasonable market estimate of the value of their portfolios each day, and that ABN's back office would have had no interest in Martignoni's subjective predictions on such a document. (Tr. 1142-45). Finally, in response to a Government request on cross-examination, Zask computed the volatilities for Martignoni's November 26 and 29, 1991 Sterling options at between 13 and 13.5% (Tr. 1231). This level was consistent with the Government's proof and drastically below the 20.69% to 29.95% reported by Martignoni.

## ARGUMENT

I.   **Martignoni Does Not Qualify For _Coram Nobis_ Relief Because He Cannot Show That He Continues To Suffer Legal Consequences From His Conviction That May Be Remedied By Granting Of The Writ of _Coram Nobis_**

### A. Applicable Law

"Coram nobis is essentially a remedy of last resort for petitioners who are no longer in custody pursuant to a criminal conviction and therefore cannot pursue direct review or collateral relief by means of a writ of habeas corpus." Fleming v. United States, 146 F.3d 88, 88-90 (2d Cir. 1998). It is not a "substitute for appeal, and relief under the writ is strictly limited to those cases in which errors . . . of the most fundamental character have rendered the proceeding itself irregular and invalid." Foont v. United States, 93 F.3d 76, 78 (2d Cir. 1996) (internal quotations and citations omitted; alteration in original). In other words, the coram nobis writ may only be issued where "extraordinary circumstances are present." Id. (quoting Nicks v. United States, 955 F.2d 161, 167 (2d Cir. 1992)). Coram nobis relief was "traditionally available only to bring before the court factual errors material to the validity and regularity of the legal proceeding itself, such as the defendant's being under age or having died before the verdict." Carlisle v. United States, 517 U.S. 416, 429 (1966) (internal quotations omitted).

In United States v. Morgan, 346 U.S. 502 (1954), the Supreme Court recognized that the All Writs Act authorized federal courts to issue coram nobis relief to a prisoner who was no longer in custody. More recently, in Carlisle v. United States, the Supreme Court indicated that coram nobis relief is all but extinct, explaining that it "is difficult to conceive of a situation in a

17

federal criminal case today where [a writ of <u>coram nobis</u>] would be necessary or appropriate."
517 U.S. at 429 (internal quotation marks omitted; alteration in original).

Thus, to obtain relief under the doctrine of <u>coram nobis</u> in this Circuit, a petitioner "must
demonstrate that 1) there are circumstances compelling such action to achieve justice, 2) sound
reasons exist for failure to seek appropriate earlier relief, and 3) the petitioner continues to suffer
legal consequences from his conviction that may be remedied by granting of the writ." <u>Foont</u>, 93
F.3d at 79 (internal quotations, citations and alterations omitted); <u>accord</u> Fleming, 146 F.3d at 90
(citing same three requirements).

When a petition for a writ of error <u>coram nobis</u> is reviewed, courts must "'presume that
the proceedings were correct'" and "'[t]he burden of showing otherwise rests on the petitioner.'"
<u>Fleming</u>, 146 F.3d at 90 (quoting <u>Nicks v. United States</u>, 955 F.2d at 167).  Moreover, this Court
will "review de novo the issue of whether the district court applied the proper legal standard, but
. . . review the district court's ultimate decision to deny the writ for 'abuse of discretion.'" <u>Id.</u>
(quoting <u>Foont</u>, 93 F.3d at 79).  "<u>Coram nobis</u> is an extraordinary remedy, and a court's
jurisdiction to grant relief is of limited scope.  The interest in the finality of judgments dictates
that the standard for a successful collateral attack on a conviction should be more stringent than
the standard applicable on a direct appeal.  It is even more stringent than that on a petitioner
seeking <u>habeas corpus</u> relief under 28 U.S.C.A. § 2255." <u>United States v. Stoneman</u>, 870 F.2d
102, 106 (3d Cir. 1989).

## B. Discussion

Martignoni cannot make the required showing that he "continues to suffer legal
consequences from his conviction that may be remedied by granting of the writ [of <u>coram
nobis</u>]," <u>Foont</u>, 93 F.3d at 79, because (1) <u>Skilling</u> leaves undisturbed Martignoni's 13 counts of
conviction for making false entries in bank records, 18 U.S.C. § 1005, and (2) those counts
constitute "aggravated felonies" under 8 U.S.C. § 1101(43) that are an independent basis for
deportation.

### 1.  Counts Two through Fourteen are Undisturbed by <u>Skilling</u>

Counts Two through Fourteen of the Indictment do not anywhere charge Martignoni with
honest services fraud, the crime at issue in <u>Skilling</u>.  Rather, each of those Counts charges
Martignoni with making a false entry in bank records in violation of 18 U.S.C. § 1005, and

nowhere do those Counts mention either "the intangible right of honest services" (or any linguistic permutation thereof) or 18 U.S.C. § 1346, the statute that defines "scheme or artifice to defraud" to "include[] a scheme or artifice to deprive another of the intangible right of honest services" and the statute that was at issue in Skilling. Nor do any of the paragraphs incorporated by reference into Counts Two through Fourteen reference that language or statute.

Moreover, as Judge Keenan's instructions to the jury made abundantly clear, none of the elements of 18 U.S.C. § 1005 contemplate or reference a scheme or artifice to defraud or the intangible right of honest services, and the jury was instructed to consider the Counts charging 18 U.S.C. § 1005 separate and apart from each other and from the other Counts:

> The indictment in this case contains a total of 16 counts. Each count charges the defendant with a different crime. You must consider each count separately, and return a separate verdict of guilty or not guilty for each of the 16 counts. Whether you find the defendant guilty or not guilty as to one or more than one count should not affect your decision as to any other offense charged. . . Concerning the charges in Counts Two through Fourteen, the government must prove the following four elements beyond a reasonable doubt:  First, that the defendant made the entry or caused it to be made in the books, reports, and statements of the bank as charged, that he either did it himself or he caused it to be done.  Second, that the defendant knew that the entry was false.  Third, that the defendant acted willfully, with the intent to injure or defraud the bank, or to deceive its officers, and fourth, that the bank is a branch or agency of a foreign bank.

(Tr. 1417, 1436-37.)  Counts Two through Fourteen thus charged Martignoni with making 13 specific false entries in bank records – not with engaging in a "scheme or artifice to defraud" or depriving ABN of the intangible right of honest services.  There is no indication that the jury disregarded Judge Keenan's clear instructions to consider each Count separately.  Accordingly, those Counts of conviction remain undisturbed by Skilling.[20]

---

[20] The defense argues that "the Government's honest services theory was so inextricably related to each of the 16 counts that the entire conviction should be set aside. . ." (Pet. 16.)  With regard to Counts Two through Fourteen in particulr, however, the defense merely argues that the jury "would not have heard any evidence from Ms. Burch" nor "evidence framed in terms of an honest services fraud scheme," and that, generally, "each count is built on top of the one preceding it." (Pet. 17.)  First, the Indictment did not incorporate paragraphs alleging deprival of the intangible right of honest services anywhere into Counts Two through Fourteen.  Second, as detailed in the "Background" section, supra, there was overwhelming evidence presented at trial that Martignoni made and caused to be made the false entries charged in Counts Two through Fourteen, and in any event there is no reason to think that Ms. Burch's testimony would not have been admissible as direct evidence of Martignoni's intent on the false entry counts and/or evidence of Martignoni causing false entries to be made.  Moreover, evidence admissible as to Counts Two through Fourteen should not be deemed void because it was "framed" in a particular manner, where, as here, the jury was properly instructed on the elements of the false entry counts and the requirement of considering guilt separately for each count.  Finally, as described infra, the inquiry undertaken in the context of coram nobis places focus on the indictment, rather than the evidence adduced.  See United States v. Keane, 852 F.2d 199, 205

## 2. Counts Two Through Fourteen are "Aggravated Felonies" Within the Meaning of 8 U.S.C. 1101(43)

Martignoni argues that the "finding [that his conviction on the conspiracy count] is an 'aggravated felony' . . . bars him virtually from all relief against this deportation" and constitutes the ongoing "legal consequences from [the] conviction" required under <u>Foont</u>, 93 F.3d at 79. Martignoni's argument fails, however, because each of his 13 counts of conviction for false entries in a bank record is undisturbed by <u>Skilling</u> and constitutes in its own right an "aggravated felony" under 8 U.S.C. § 1101(43). Thus, even if the Court were to find that <u>Skilling</u> requires vacatur of Counts One, Fifteen and Sixteen, Martignoni will be in the same position with regard to removal proceedings as he would be with the convictions in place; the convictions on Counts One, Fifteen and Sixteen do not cause Martignoni "to suffer legal consequences . . . that may be remedied by granting of the writ." <u>Id.</u>

Martignoni's convictions for making false entries in bank records, 18 U.S.C. § 1005, are "aggravated felonies" under 8 U.S.C. § 1101(43) because each is "an offense that . . . involves fraud or deceit in which the loss to the victim or victims exceeds $10,000." 8 U.S.C. § 1101(43)(M). Here, pursuant to Judge Keenan's instructions, to convict under Section 1005 the jury must have found, <u>inter alia</u>, that the defendant made or caused to be made the false entries, that the defendant <u>knew</u> such entries to be false, and that the defendant intended to injure or defraud the bank, or to deceive its officers. These required elements – and in particular the <u>scienter</u> element – of Section 1005 cause it to fall within the broad language of 8 U.S.C. § 1101(43)(M)(i), namely, that it is an offense that "involves fraud or deceit." <u>See</u> <u>In Re: Harish Sunkara</u>, 2010 WL 3780646 (Board of Immigration Appeals Sept. 15, 2010)[21] (unpublished decision not cited for precedential effect) (rejecting Sunkara's argument that "making a false bank record entry [under Section 1005] does not qualify categorically as an 'offense that . . . involves fraud or deceit'" and stating "The gravamen of the offense is the deliberate making of a false statement, intending both that the statement be taken as true by another and that the other

---

(7th Cir. 1988) (denying a petition for writ of <u>coram nobis</u> and stating "We do not say that Keane's conviction would today be affirmed on appeal. The intangible rights approach was such a centerpiece of the trial that it would be difficult to conclude . . . that a jury instructed as this one was **necessarily** found the existence of a scheme to defraud someone of "property" . . . As we have emphasized, however, and as Keane's lawyer conceded at oral argument, if the indictment states an offense, that is the end of things for relief in the nature of coram nobis.")(emphasis in original).

[21] This opinion is attached hereto as Exhibit C.

(or some third party) will be injured as a result of the misimpression thereby created. Such an offense necessarily involves 'deceit.'").

Furthermore, Martignoni's false bank record entry convictions clearly meet Section 1101(43)(M)'s requirement that "the loss to the victim or victims exceeds $10,000" for two reasons. First, ABN incurred brokerage commissions from the November 26 and 29, 1991, trades and the trades that Martignoni later engaged in, in his attempted cover-up of the November 26 and 29 trades. Martignoni paid an approximate total of $4.3 million for the 13 Sterling call options that he bought on November 26 and 29, 1991 (although based on his inflated volatility figures, the FENICS computer valued them at over $44 million). (Tr. 1209-13.) Even considering the November 26 and 29 trades alone (and not the December 3, 1991, sale of Sterling call options or the sale of put options that Martignoni engaged in as a direct consequence of the November 26 and 29 trades), the commissions incurred by ABN would be approximately 1.2% of $4.3 million, see n.20, supra, or approximately $51,600. The trade underlying Count One involved a premium of $145,000, (Tr. 1209-10), and therefore an approximate brokerage fee of $17,400. When ABN's loss from brokerage commissions on the trades used to conceal – and then the trades used to unwind – the November 26 and 29 transactions are taken into account, it is clear that the Petitioner cannot meet his burden of showing that he suffers from an ongoing "legal consequence." Foont, 93 F.3d at 79; see Nijhawan v. Holder, 129 S.Ct. 2294, 2302 (2009) (holding that "Congress did not intend subparagraph [8 U.S.C. §1101(43)(M)(i)'s] monetary threshold to be applied categorically, i.e., to only those fraud and deceit crimes generically defined to include that threshold. Rather, the monetary threshold applies to the specific circumstances surrounding an offender's commission of a fraud and deceit crime on a specific occasion.").

Second, ABN incurred approximately $20 million in additional losses from "the closing hours of Mr. Martignoni's options and currency positions." (Tr. 473.) This $20 million dollar loss was in addition to the approximately $50 million in loss that Martignoni had accumulated up until the end of November, 1991. (Tr. 472-74.) Given the magnitude of these losses and the size of the positions that Martignoni established through the November 26 and 29, 2010, trades, it is clear that at least one of the thirteen trades from Counts Two through Fourteen caused at least $10,000 of the approximate $20 million loss due to the unwind. In any event, it is clear that the Petitioner cannot meet his burden of showing that each of his convictions on Counts Two

21

through Fourteen are not "aggravated felonies" and therefore not independent grounds for his deportation.

In sum, because Martignoni's 13 convictions for making false bank record entries under 18 U.S.C. § 1005 are undisturbed by <u>Skilling</u> and because each constitutes an "aggravated felony" providing grounds for deportation, Martignoni does not "suffer legal consequences . . . that may be remedied by granting of the writ." <u>Foont</u>, 93 F.3d at 79.

## II. **An Independent Basis For Denial Of The Petition Is That Coram Nobis Relief Is Unavailable Where, As Here, The Indictment States A Legally Valid Theory Of Conviction, The Evidence Supported Such Theory, and Such Theory Was Submitted To The Jury**

### A. **Applicable Law**

Use of the writ of <u>coram nobis</u> is appropriate to correct errors that "go to the jurisdiction of the trial court, thus rendering the trial itself invalid. An error which could be remedied by a new trial, such as an error in jury instructions, does not normally come within the writ." <u>United States v. Stoneman</u>, 870 F.2d 102, 106 (3d Cir. 1989). In the precise context of <u>coram nobis</u> petitions seeking relief from convictions for honest services fraud – but prior to the enactment of the current 18 U.S.C. § 1346 – both the Third and Seventh Circuits have held that, even where no legally valid theory of criminal liability was submitted to the jury, <u>coram nobis</u> relief is unavailable. In <u>United States v. Stoneman</u>, the petitioner sought a writ of <u>coram nobis</u> to vacate his conviction for conspiracy to violate the mail fraud statute, 18 U.S.C. § 1341. 870 F.2d at 104. Although it found that "the district court erred, under [<u>McNally v. United States</u>, 483 U.S. 350 (1987)], in instructing the jury that it could convict Stoneman of mail fraud solely on an [invalid] intangible rights theory," the Third Circuit held that Stoneman did not suffer a conviction for conduct that was not criminal because the "indictment against Stoneman charged and the evidence the jury heard established an offense within the meaning of § 1341, as interpreted by the Supreme Court in <u>McNally</u>." <u>Id.</u> at 108. Put another way, for a petitioner to meet his burden for <u>coram nobis</u>, it "is not enough for him to show that [his conviction] <u>may</u> have been invalid," a conclusion the Third Circuit deemed to "properly balance[] the tension between principles of finality and the law's ideal of seeing that no man is improperly convicted." <u>Id.</u>

The Seventh Circuit has gone one step further, holding that the mere fact that "the indictment states an offense" is sufficient to "require the denial of relief in the nature of coram nobis." United States v. Keane, 852 F.2d 199, 206 (7th Cir. 1988). In Keane, the petitioner sought coram nobis relief to vacate his conviction on one count of mail fraud, 18 U.S.C. § 1341, again in the wake of McNally. Drawing a distinction with the standard of review on direct appeal – "We do not say that Keane's conviction would today be affirmed on appeal." – the Seventh Circuit found sufficient that the "indictment notified Keane of [validly chargeable] aspects of the scheme," concluding that "if the indictment states an offense, that is the end of things for relief in the nature of coram nobis." Id. at 205. The Court went on to state the rationale that supports this limitation on coram nobis relief, stating, "No one can accept without unease the thought that the legal system tolerates erroneous convictions. Yet we live in a world of scarcity, one in which that most inflexible commodity, time itself, sets a limit on our ability to prevent and correct mistakes. Every legal system tolerates a risk of error. It tries to find procedures that will hold error to a minimum, but then it must move on." Id. at 206. In United States v. Bush, the Seventh Circuit affirmed Keane's holding that "the writ [of coram nobis] should issue only when the petitioner . . . establishes that the indictment does not state an offense." 888 F.2d 1145, 1146 (7th Cir. 1989); cf. United States v. Mandel, 862 F.2d 1067, 1072, 1074 (4th Cir. 1988) (granting coram nobis relief where the indictment did not state an offense and no valid theory of criminal liability was submitted to the jury).

### B. Discussion

Martignoni's claims do not qualify for coram nobis relief. Under Stoneman, Keane and Bush, Martignoni must meet his burden of demonstrating that "the indictment does not state an offense." See, e.g., Bush, 888 F.2d at 1146. Not only is it abundantly clear that the Indictment at issue in this case stated an offense – indeed multiple offenses – it is also clear that overwhelming evidence supported those offenses and that a legally valid (post-Skilling) theory was submitted to the jury.

First, as described supra, Counts Two through Fourteen of the Indictment, the false bank record entry counts, do not involve the statutes at issue in Skilling and each states an offense. Second, Count One clearly states an offense because it is a conspiracy charge with two objects – making false entries under 18 U.S.C. § 1005 and bank fraud under 18 U.S.C. § 1344 – and that first object is unaffected by Skilling. Count 15 likewise states an offense, as it charges that

23

Martignoni "willfully and knowingly did execute and attempt to execute a scheme and artifice to defraud ABN AMRO, a branch of a foreign bank, and to deprive ABN AMRO of the intangible right of honest services, and to obtain by false and fraudulent pretenses, representations and promises, certain moneys, funds, credits and assets owned by and under the custody and control of ABN AMRO. . ."   (Indictment ¶ 11 (emphasis added).)   Count 15 thus stated the offense of bank fraud under the typical money-or-property theory of liability, which is separate from the intangible right of honest services theory that is arguably defeated by Skilling.   Only Count 16, which did not expressly mention what Martignoni sought to receive through his scheme, could be subjected to a Skilling challenge.   As noted above, the fact that the Indictment stated at least one valid offense is alone sufficient grounds for denial of the petition for coram nobis relief.

    In addition to the fact that the Petitioner cannot meet his burden of establishing that the Indictment did not state an offense, the jury in this case was charged on valid post-Skilling theories on at least Counts One through Fifteen.   Judge Keenan's instruction on Count One made it clear that the jury could base a guilty finding solely on the false bank record entries object:   "In order to find the defendant quilty of the conspiracy charged in Count One, you must find that one of the violations of the law I mentioned was the object of the conspiracy; that is, you must find that an objective of the conspiracy was either to file false records or to defraud the bank.   The government is not required to establish both of the objectives of the conspiracy.   It is sufficient if it establishes one of them."   (Tr. 1426.)   Judge Keenan's jury instructions as to Counts Two through Fourteen clearly instructed the jury on valid theories of liability post-Skilling because those counts charge an offense that is completely separate from the intangible right of honest services theory at issue in Skilling.   Indeed, the Court's instructions on these Counts unsurprisingly did not mention the intangible right of honest services at any point, and the only theory on which the jury could have convicted was a valid false bank record entry theory.   (Tr. 1435-39.)   In addition, the Court's instructions as to Count 15 permitted a jury finding under a valid theory of liability:   "first, that on or about the dates set forth in the indictment in the Southern District of New York, the defendant engaged in a scheme or artifice to defraud or obtain money, property, or to deprive the bank of the intangible right of honest services, and that this was done to defraud ABN AMRO."   (Tr. 1441-42 (emphasis added).)

    Finally, the Government adduced a staggering amount of evidence in support of the legally valid theories charged in Counts One through Fifteen.   This evidence consisted of (1) 31

recorded conversations between the petitioner and Kristen Burch in which his own words make painfully obvious his criminal intent, his attempt to cover-up his criminal acts and his promises to pay Burch $50,000 in order to ensure her complicity in the cover-up; (2) the testimony of Kristen Burch herself confirming the various criminal acts Martignoni engaged in; (3) testimony of Martignoni's friend, Phil Mastrandrea, detailing Martignoni's confession that he had falsely marked his volatilities (Tr. 808); and (4) a mountain of documentary evidence detailing the numerous aspects of the fraud.

The Petitioner has not met his burden – nor could he – of establishing that the Indictment does not state an offense.  On the contrary, it is clear that the Indictment states numerous offenses, and that those offenses were amply supported by the evidence and duly presented to the jury.  This provides a wholly-independent basis from that provided in Argument Section I for dismissal of Martignoni's Petition.

## CONCLUSION

For the foregoing reasons, the Court should deny in its entirety Martignoni's Petition for a writ of coram nobis.

Respectfully submitted,

Preet Bharara, United States Attorney
Southern District of New York

By:  _____

Jonathan Cohen, Assistant United States Attorney
Tel.: (212) 637-2408

Dated: New York, New York
       December 3, 2010

25

## CERTIFICATE OF SERVICE

I, Jonathan Cohen, Assistant United States Attorney for the Southern District of New

York, hereby certify that on December 3, 2010, I caused a copy of the foregoing Memorandum

of Law of the United States of America in Opposition to the Petitioner's Motion for *Coram*

*Nobis* Relief to be served by ECF filing upon the following:

> Valerie B. Robin, Esq.
> Attorney for James Martignoni
> Law Offices of Valerie B. Robin
> 60 State Street, Suite 700
> Boston, MA 02109
> val@robinlawoffices.com

Dated: New York, New York
December 3, 2010

Jonathan Cohen
Assistant United States Attorney
(212) 637-2408