UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
JAMES MARTIGNONI,                         :
                                          :
                    *Petitioner*,         :          92 Cr. 1097 (JFK)
                                          :          10 Civ. 6671 (JFK)
       -against-                          :
                                          :     **OPINION AND ORDER**
UNITED STATES OF AMERICA,                 :
                                          :
                    *Respondent*.         :
------------------------------------------------------------- X

APPEARANCES:

        For Petitioner, James Martignoni:

                Law Offices of Valerie B. Robin
                60 State Street, Suite 700
                Boston, MA 02109

                By:     Valerie B. Robin, Esq.

        For Respondent, the United States of America:

                Preet Bharara, United States Attorney for the Southern District of New York

                By:     Assistant United States Attorney Jonathan Cohen

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED:____October 12, 2011____

**John F. Keenan, United States District Judge**

**John F. Keenan, United States District Judge:**

Facing deportation resulting from a criminal judgment entered by this Court on March 15, 1994, James Martignoni ("Martignoni" or "Petitioner") petitions the Court for a writ of error *coram nobis* to vacate that criminal judgment. Petitioner cites the Supreme Court of the United States' decision in *Skilling v. United States*, 130 S. Ct. 2896 (2010), and argues that the issuance of a writ of error *coram nobis* is warranted to vacate his conviction because at trial the Government relied on an interpretation of the honest-services fraud statute, 18 U.S.C. § 1346, that the Supreme Court has since determined "transgress[es] constitutional limitations." *Skilling*, 130 S. Ct. at 2932. The Government opposes the petition and argues that a writ of error *coram nobis* is unavailable to Martignoni because the Indictment stated a legally valid theory of conviction and sufficient evidence in support of that theory was presented to the jury. In the alternative, the Government argues that the charges of conspiracy and making false entries in bank records are unaffected by *Skilling* and bar the issuance of the writ of error *coram nobis* in this case.

For the reasons stated below, I grant Martignoni's petition for a writ of error *coram nobis* with respect to the charges of conspiracy and bank fraud, but deny relief with respect to the charges of making false entries in bank records.

## I.  Background

James Martignoni is a forty-seven-year-old software engineer who lives in Newton, Massachusetts. He was born in Australia and is an Australian national, but he has lived in the United States as a permanent resident since 1988. He is currently married to a United States citizen, and has two children from a prior marriage. Both his former wife and his two children are United States citizens. After a jury trial held in the fall of 1993, Martignoni was found guilty on all sixteen counts of the Indictment, which included charges of conspiracy, bank fraud, and making false entries in bank records. Though the Government long exercised its discretion not to remove

Martignoni despite his conviction, and even re-approved his status as a lawful permanent resident in 2002, on September 9, 2008, the Government served Martignoni with a Notice to Appear charging Martignoni "with inadmissibility . . . as an alien who has been convicted of a crime involving moral turpitude." (Pet. for *Coram Nobis* Ex. A, Decision of the Boston Immigration Court ("Immigration Court Decision") 2, Civ. Dkt. No. 1.)

## A.     Martignoni's Work at ABN AMRO

ABN AMRO Bank N.V. ("ABN AMRO") is a Dutch bank headquartered in Amsterdam. It was formed in 1991, when the Algemene Bank Nederland ("ABN") merged with the Amsterdam-Rotterdam Bank. In November 1990, ABN hired Martignoni to work as a Vice President in its New York branch, when he was just twenty-six years old. Martignoni was tasked with trading foreign exchange options and his compensation included a salary of $110,000 and an annual bonus of 5% to 12% of the profits generated though his trading activities. Prior to joining ABN, Martignoni worked for the Bank of Boston in Boston, Massachusetts.

At ABN, Martignoni worked with the head foreign exchange trader in New York, Michael Guarino ("Guarino"), and assistant trader Kristen Burch ("Burch"). In its criminal case against Martignoni, the Government accused him of conspiring with Burch to inflate the value of certain options he was trading in order to appear more profitable than he actually was, thus increasing his remuneration.

Foreign exchange options, like those Martignoni traded, are derivative instruments. The value of a derivative depends on the value of an underlying asset. In the case of a foreign exchange option, the underlying asset is a foreign currency. Options come in two basic varieties: calls and puts. One who issues a call option (the issuer) promises to sell a specified quantity of foreign currency at a pre-specified price, referred to as the "strike price," to another (the holder). A put option is a promise by the issuer to purchase from the holder a specified quantity of foreign

currency at a certain strike price.  The issuer is obligated to carry out the transaction at the holder's election, but the holder of an option is under no obligation to exercise his or her rights under the option, and will typically exercise those rights only if profitable at the time the rights mature.  For example, one who holds a call option for 50 shares of Stock A with a strike price of $50 can use the call option to obtain those 50 shares at a price of $2500.  If the market price of Stock A is above $50, the option holder can exercise the option and then sell at the market price the 50 shares obtained through the option contract, with the difference between the market price and the option price, less the cost of the option, as profit.  Therefore a call option is valuable when the market price of the underlying asset exceeds the strike price and a put option is valuable when the strike price exceeds the market price of the underlying asset.

Two terms commonly applied to options are "in the money" and "out of the money."  A call option is in-the-money when the current market price exceeds the strike price, and is out-of-the-money when the strike price exceeds the current market price.  Conversely, a put option is in-the-money when the strike price exceeds the current market price, and is out-of-the-money when the current market price exceeds the strike price.  In other words, an option is in-the-money if exercising the option under current market conditions would be favorable and out-of-the-money if exercising it under current market conditions would not be favorable.  A third term, "at the money," is used to describe situations in which the strike price is close to the market price.

Out-of-the-money options can be profitable (though risky) investments because the price of the underlying asset can change with time.  These options are valued in the market place according to the probability that they will become in-the-money at some point in the future.  One of the factors that can influence the likelihood that an out-of-the-money option could become in-the-money is the volatility of the underlying asset.  Although a number of factors can influence the value of an option, holding all else equal, an out-of-the-money option will be valued more highly if the

underlying asset is more volatile. Because they trade at a premium, options that are deeply out-of-the-money can be valued using volatilities that are slightly higher than the volatilities used to calculate the value of at-the-money options.

At ABN AMRO, Martignoni and Burch used a computer program referred to by the acronym "FENICS" (pronounced like "phoenix") in order to compile trade data and generate valuation reports. At the end of every trading day, Martignoni was required to submit these valuation reports along with trade tickets reflecting the terms of every option trade and a daily profit-and-loss statement, referred to as a "P&L." He and other traders were required to reduce the risk of their trades by purchasing or selling short certain amounts of the underlying asset as a hedge. For example, a call option that would go in-the-money after an increase in the price of a particular foreign currency might be hedged by a short position in that foreign currency, so that if the price declined ABN's losses would be mitigated. ABN's back office, which was responsible for accounting in addition to other business functions, used different software called the "TUFFS" system to track the bank's profits and losses, but relied on the data provided by ABN traders to make entries in the TUFFS system.

According to the Government, in September 1991, Martignoni and Burch began testing the value of their portfolio using a range of different volatilities throughout the trading day. One valuation showed an apparent $20 million loss when applying at-the-money option volatilities, and Martignoni instructed Burch to submit a valuation report to the back office using higher volatilities in order to disguise the potential losses. These higher volatility values were used by Martignoni throughout the fall of 1991. At times, Martignoni valued his options with volatility values that were more than double the published at-the-money volatilities. In October 1991, Michael Geslak, the Assistant Vice President in charge of financial reporting for the foreign exchange trading desk questioned Martignoni about his practice of purchasing options and quickly revaluing them with

higher volatility values.  Martignoni explained that it was a common practice to use higher volatilities for deeply out-of-the-money options.  Martignoni did not disclose that the market prices of such options would likely be lower than the value he had computed using the dramatically higher volatility values.

In late November 1991, Martignoni, Guarino, and other senior traders were scheduled to take a one-week business trip to visit ABN's home office in Amsterdam.  After his visit to Amsterdam, Martignoni was scheduled to go on to Australia before returning to New York. Because Martignoni would be away for nearly a month in total, Guarino asked him to unwind a number of his positions so that the overall risk of his outstanding trades would be between $1 million and $3 million.  Guarino believed that Burch, Martignoni's assistant, could manage only this reduced level of risk while Martignoni was away.  In response to Guarino's instructions, between November 26 and November 29, Martignoni sold off almost all of his options positions.  However, Martignoni also purchased 13 additional call options (the "Sterling Options"), each for 100 million British Pounds Sterling, for a premium of $4.3 million.  These options had expiration dates ranging from December 18, 1991, to September 14, 1992, and strike prices ranging from $187 million to $210 million.  In total, the Sterling Options gave ABN the right to purchase £1.3 billion, and under then-existing risk management policies, had to be hedged with a £200 million short position. According to the Government, managing this position would have required skill and experience that Burch did not possess.

The Government alleges that, in order to hide earlier trading losses, Martignoni and Burch acted in concert to revalue the Sterling Options, purchased for $4.3 million, at approximately $44 million.  The $44 million valuation was based on assigned volatilities ranging from 20.72% to 29.95%, whereas the appropriate at-the-money volatilities would have been around 12% at the time. Subsequently, Guarino learned about the Sterling Options and ordered Martignoni to sell the

options.  Martignoni and Burch argued against selling the options immediately, taking the position that ABN would lose money from the transactions immediately because the options were thinly traded at the time.  Guarino insisted that Martignoni and Burch sell the Sterling Options, but instead of selling all the Sterling Options, Martignoni and Burch sold five put options and sold only eight of the Sterling Options.  Six of the eight options sold back to the original counterparties were recorded as being sold for $18 million, rather than the actual sale price of $1.8 million.  Burch and Martignoni discussed various ways to delay the discovery of Martignoni's apparent trading losses, and Burch attempted to convince a back-office clerk to report that the trades had been confirmed at $18 million, but eventually Guarino discovered these efforts.

Guarino and Martignoni flew back to New York on December 5, 1991.  As Guarino and other ABN employees sifted through Martignoni's trading records in an attempt to figure out precisely what had happened, Martignoni left and did not return to work.  According to the Government, ABN lost $20 million when it unwound Martignoni's purchase of the Sterling Options, and lost a total of $70 million as a result of Martignoni's trading activity.

**B.**     **Indictment, Trial, Sentencing, and Appeal**

On December 10, 1992, the Government indicted Martignoni on charges of conspiracy, making false entries in bank records, and bank fraud.  The trial on these charges began on October 20, 1993.  Over the course of the ten-day trial, the Government presented testimony from Burch, Guarino, and Geslak.  The Government also presented testimony from John McCarthy, an employee of ABN who left in December 1991, Antonio Marfia, an employee of the New York State Banking Department, Phillip Mastrandrea, who had worked for a company that traded foreign exchange options with Martignoni, and, by deposition, Carolyn Melendez, a clerk in ABN's back office.  Martignoni called only one witness:  Ezra Zask, a consultant who specialized in international currency trading.  Martignoni did not testify.

On November 8, 1993, the parties gave their summations and I charged the jury.  During its summation, the Government argued that Martignoni "took advantage of [ABN's] trust, deprived the bank of money in the form of his salary and bonuses which were based upon his submissions and his statements, and deprived ABN AMRO of its intangible right to his honest services." (Trial Tr. 1304:6–13.)   The Government recognized the possibility that ABN AMRO itself "could have prevented [its losses] or stopped [Martignoni's] crime from occurring." (*Id.* at 1303:8–9.) Martignoni's counsel discussed subjective aspects of options valuation, Martignoni's attempt to obtain help from Geslak on his trading desk, and his disclosure of cash positions in support of his argument that Martignoni had no criminal intent to defraud the bank, despite making errors in judgment. (*Id.* at 1334:13-1385:25.)

After the parties' requests to charge had been considered, the jury was instructed that it could find Martignoni guilty of conspiracy in violation of 18 U.S.C. § 371 under Count One of the Indictment by finding either that he conspired with Burch to defraud the bank or that the two conspired to make false entries in bank records. (*Id.* at 1426:13–20.)  The jury was further instructed that it could find Martignoni guilty of making false entries in bank records in violation of 18 U.S.C. § 1005 under Counts Two through Fourteen of the Indictment should it find that:  (1) Martignoni made or caused to be made entries in the books or records of the bank; (2) he knew those entries were false; (3) he acted with the intent to injure or defraud the bank, or to deceive its officers; and (4) the bank is a branch or agency of a foreign bank. (*Id.* at 1436:22–1437:7.)  With respect to Counts Two through Fourteen, I further instructed the jury that it was unnecessary "for the [G]overnment to prove that the bank actually suffered any loss."  (*Id.* at 1439:7–9.)

The jury was next charged with respect to Counts Fifteen and Sixteen of the Indictment, and instructed that it could find Martignoni guilty of committing bank fraud in violation of 18 U.S.C. § 1344 if it determined the Government had proven three elements:  (1) that "the defendant engaged

in a scheme or artifice to defraud or obtain money, property, or to deprive the bank of the intangible right of honest services;" (2) that Martignoni had knowingly and willfully engaged in that scheme or artifice; and (3) that ABN AMRO was a "branch or agency of a foreign bank." (*Id.* at 1441:21–1442:14.)  ABN AMRO's "intangible right to honest services" was mentioned while the jury was instructed on the first two elements of the Government's bank fraud charges in detail. (*See id.* at 1442:15–20, 1445:20–25, 1446:18–23.)

With respect to Counts Two through Sixteen, the jury was also instructed that they could find Martignoni guilty of aiding and abetting the making of false entries in bank records or bank fraud in violation of 18 U.S.C. § 2 if they determined that Martignoni had "participate[d] in the [commission of a crime] as something that he wished to bring about or to accomplish" or sought "by his actions to make the criminal venture succeed." (*Id.* at 1449:19-1450:3, 1450:16–23.)

During their deliberations, the jury sent three notes to the Court, requesting that parts of the charge be repeated.  First, the jury requested "a legal definition of conspiracy." (*Id.* at 1470:23–24.) The jury then requested a "legal explanation of 'bank fraud'." (*Id.* at 1473:6.)  The jury was told that the relevant statute, 18 U.S.C. § 1344, made it an offense against the United States for one knowingly to "execute a scheme or artifice to defraud a financial institution or to obtain any of the moneys . . . [or] other property owned by or under the custody or control of a financial institution by means of false or fraudulent pretenses." (*Id.* at 1473:14–20.)  The jury was expressly informed that "a scheme or artifice to defraud includes a scheme or artifice to deprive another of the intangible right of honest services." (*Id.* at 1473:22–25.)  Finally, the jury sent a note which was read into the record:  "Your Honor, please qualify the difference between Counts Fifteen and [S]ixteen. Thank You. . . . P.S.: Please explain why there are two counts, Fifteen and Sixteen, instead of one. Doesn't Count Sixteen fall within the confines of Count Fifteen?" (*Id.* at 1474:7–12.)  I explained to the jury that there could be different ways of committing the same crime, and that therefore a

defendant could be charged with multiple counts of the same crime. (*Id.* at 1474:20–24.)  The jury was told that Count Fifteen charged Martignoni with "engaging in bank fraud with Kristen Burch by deceiving ABN AMRO into believing that the options desk had produced millions of dollars in profits when it had actually lost tens of millions of dollars and was exposed to great financial risk" in order to obtain salary and benefits, and that Count Sixteen charged Martignoni with "engaging in bank fraud with Kristen Burch by falsely inflating the volatilities of six options that ABN AMRO purchased from Bankers Trust and then instructing Kristen Burch to sell the options back to Bankers Trust" and of "instruct[ing] Kristen Burch to make sure that ABN AMRO did not discover the alleged ten-fold increase in the Bankers Trust sale amounts." (*Id.* at 1475:11-1476:2.)

At the conclusion of the jury's deliberations, the jury returned a guilty verdict on all counts. Martignoni moved for a judgment of acquittal and, in the alternative, for a new trial.  The motion was denied. *See United States v. Martignoni*, No. 92 Cr. 1097 (JFK), 1994 WL 48809 (S.D.N.Y. Feb. 17, 1994).

Martignoni was sentenced to a term of twenty-one months' imprisonment on Count One and a concurrent twenty-one month term of imprisonment on Counts Two through Sixteen on March 15, 1994.  Martignoni was ordered to pay $800 for the mandatory special assessment on each count and was sentenced to a term of supervised release for three years following his release from custody. (Sentencing Tr. 28:23–29:19.)  It was determined that this was the appropriate sentence based on a finding that the appropriate offense level was eighteen, that the appropriate criminal history category was I, and that departure under Section 5K2.10 of the United States Sentencing Guidelines was warranted because "ABN AMRO, by its wrongful conduct, contributed significantly to the offense behavior" that led to Martignoni's conviction. (*Id.* at 27:11–18.)  Specifically, I found that ABN AMRO did not adequately train Martignoni, that it did not provide him with help that he had requested, and that it "failed to follow its own policy or the federal recommendations

concerning the options trading." (*Id.* at 27:15–24.)   In finding that a departure under U.S.S.G. § 5K2.10 was appropriate, I also relied in part on a letter submitted by one Greg Bentley, Martignoni's supervisor during his earlier days at the Bank of Boston, which stated:

> I do not believe that [Martignoni] was at that time professionally prepared to run an options desk by himself, lacking the requisite experience to be placed in such a position of authority and risk.  If I had been contacted by [ABN AMRO] for a reference, I would have said that Mr. Martignoni had the potential to develop into a qualified market professional, but that he was not ready or able, in my opinion, to be in charge of a stand-alone operation without considerable direct supervision from the senior market technician.

(*Id.* at 28:9-18.)  Finally, at the sentencing hearing, bail was granted pending Martignoni's appeal.

On appeal, Martignoni raised three arguments.   The first two, which challenged the sufficiency of the evidence presented at trial and a conscious avoidance charge, are not relevant to Martignoni's *coram nobis* petition.   Martignoni's third contention on appeal, however, was that "the statutory definition of a 'scheme or artifice to defraud' to include a scheme to deprive another of 'the intangible right of honest services,' [was] unconstitutionally vague." *See United States v. Martignoni*, 122 F.3d 1058, 1995 WL 1995 WL 595093, at *2 (2d Cir. 1995) (unpublished table decision). Recognizing that "a vagueness challenge to a statute that does not involve First Amendment freedoms" requires evaluation of the statute on an "as applied" basis, the United States Court of Appeals for the Second Circuit rejected Martignoni's vagueness challenge to the honest-services fraud statute, 18 U.S.C. § 1346, and found that "the statutes under which Martignoni was charged required the government to prove his specific intent to defraud his bank employer." *Id.* at *2 (citations omitted).  The Second Circuit did not address the specific question of whether or not the term "intangible right to honest services" was unconstitutionally vague.

Martignoni served the sentence that was imposed in March 1994.  In 1998 and 2000, Martignoni and his wife had two children.  In 2002, he requested permission to reside in the United States permanently, and the Government granted his request.  Six years after granting Martignoni's

request for renewal of his permanent resident status and nearly seventeen years after the conduct charged in the Indictment, the Government began attempts to revoke Martignoni's long-standing status as a permanent resident.

**C.     Proceedings Before the Boston Immigration Court and the Board of Immigration Appeals**

Between 1994 and 2008, Martignoni travelled abroad and returned to the United States without incident twelve times.  In July 2008, on his thirteenth return trip to the United States, he was detained at John F. Kennedy International Airport in Queens, New York.  On September 9, 2008, the Government charged Martignoni with inadmissibility pursuant to Section 212(a)(2)(A)(i)(I) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(a)(2)(A)(i)(I).

Before the United States Immigration Court, Boston, Massachusetts, Martignoni sought cancellation of removal under INA § 240A(1), 8 U.S.C. § 1229b, and waiver of inadmissibility under INA § 212(h), 8 U.S.C. § 1182(h), and the repealed Subsection 212(c) of INA, 8 U.S.C. § 1182(c) (1994 & Supp. I), *repealed by* Pub. L. 104-208, Sept. 30, 1996.  On May 4, 2010, the Boston Immigration Court granted the Government's motion to pretermit Martignoni's applications for cancellation of removal and waiver of inadmissibility on the ground that Martignoni's convictions for bank fraud and conspiracy to commit bank fraud constitute aggravated felonies as defined by INA § 101(a)(43)(M)(i), 8 U.S.C. § 1101(a)(43)(M)(i), which defines an "aggravated felony" to include "an offense that involves fraud or deceit in which the loss to the victim or victims exceeds $10,000."

Martignoni appealed the Boston Immigration Court's decision, but on August 31, 2011, the Board of Immigration Appeals ("BIA") dismissed the appeal.  The BIA held that "[d]espite its 1994 date, [Martignoni's] crime is considered an aggravated felony based on the enactment of [the Illegal Immigration Reform and Immigrant Responsibility Act] in 1996." (Pet.'s Ltr. Dated September 9, 2011 Ex. A, Board of Immigration Appeals Decision 2.)  The BIA recognized that Martignoni

"requested to be placed in proceedings in 1994, when he was eligible to apply for relief from deportation," but described the loss of Martignoni's only avenue for relief that resulted from the Government's exercise of its prosecutorial discretion simply as "unfortunate." (*Id.* at 3.)

## D.   Procedural History of the Instant Petition

Martignoni filed his petition for a writ of error *coram nobis* on September 8, 2010.   After reviewing the parties' briefs and a number of letters from members of Martignoni's family, I heard oral argument on the petition on April 6, 2011.   Since April, additional letters have been sent by the parties, addressing primarily ancillary issues, such as whether a district court has the authority to issue a stay of removal proceedings and the BIA's ruling.   Because today I am granting the *coram nobis* petition in part, these ancillary issues are moot.

## II.  Discussion

A petition for a writ of error *coram nobis* is a collateral attack on a conviction. *Wall v. Kholi*, 131 S. Ct. 1278, 1284–85, 1288–89 (2011).   Unlike a petition for the issuance of a writ of *habeas corpus* under 28 U.S.C. § 2254 or a motion attacking a sentence pursuant to 28 U.S.C. § 2255, a *coram nobis* petition is available even though a petitioner is no longer in custody under the conviction which petitioner seeks to challenge. *See United States v. Morgan*, 346 U.S. 502, 512-13 (1954) (finding *coram nobis* relief available "[a]lthough the term has been served" with respect to the challenged conviction).

A petitioner seeking issuance of a writ of *coram nobis* to vacate a judgment of conviction must show that: (1) the judgment of conviction resulted from proceedings that were rendered "irregular and invalid" by "errors of the most fundamental character," *Foont v. United States*, 93 F.3d 76, 78 (2d Cir. 1996) (quoting *United States v. Carter*, 437 F.2d 444, 445 (5th Cir. 1971)); (2) the petitioner continues to "suffer legal consequences from [a] conviction that may be remedied by granting of the writ," *Nicks v. United States*, 955 F.2d 161, 167 (2d Cir. 1992); (3) there are "sound reasons . . . for

[the petitioner's] failure to seek appropriate earlier relief," *Id.* at 167 (quoting *United States v. Morgan*, 346 U.S. 502, 512 (1954)); and (4) there are "circumstances compelling [the issuance of the writ] to achieve justice," *Nicks*, 955 F.2d at 167 (quoting *Morgan*, 346 U.S. at 511).

The Government advances a standard for *coram nobis* relief based on the United States Court of Appeals for the Third Circuit's decision in *United States v. Stoneman*, 870 F.2d 102 (3d Cir. 1989), and the United States Court of Appeals for the Seventh Circuit's decisions in *United States v. Keane*, 852 F.2d 199 (7th Cir. 1988), and *United States v. Bush*, 888 F.2d 1145 (7th Cir. 1989). According to the Government, *Stoneman*, *Keane*, and *Bush* demonstrate that *coram nobis* relief is unavailable where an indictment stated any offense against the petitioner and sufficient evidence in support of that offense was presented to the jury. The Court declines to follow these cases because they are not binding on this Court, which follows Second Circuit precedent.

The *Keane* decision's holding that an error is not sufficiently fundamental in order to warrant the issuance of a writ of error *coram nobis* where "the indictment states an offense" is inapplicable where constitutional rights are threatened by refusing to grant the writ. For example, in *Nicks*, the Second Circuit recognized that a district court may issue a writ of error *coram nobis* where a constitutionally-required competency hearing was denied prior to a criminal trial. *Nicks*, 955 F.2d at 167. Because a failure to provide a competency hearing "deprives a defendant of his constitutional right to a fair trial," it "renders the conviction void." *Id.* Therefore, the *Keane* decision does not accurately state the proper standard for analyzing a *coram nobis* petition in the Second Circuit. As such, so long as a petitioner demonstrates fundamental errors in the proceedings that led to the petitioner's conviction and there are persistent adverse legal consequences resulting from that conviction, a district court may exercise its discretion to grant the writ when doing so would be in the interest of justice.

A.      **Fundamental Flaws in the Petitioner's Criminal Trial**

In determining whether there were "fundamental flaws" in the proceedings that led to Martignoni's conviction, I first address his claim that the Supreme Court's *Skilling* decision rendered legally invalid the jury verdict with respect to Counts One, Fifteen, and Sixteen of the Indictment. I then address his claim that the jury verdict with respect to Counts Two through Fourteen was tainted by prejudicial spillover from the charges related to honest services fraud.

1.      **Honest Services Fraud and Counts One, Fifteen, and Sixteen**

With respect to Counts One, Fifteen, and Sixteen of the Indictment, Martignoni argues that the proceedings leading to his conviction on these counts were flawed because the Supreme Court held in *Skilling* that, properly interpreted to avoid issues of unconstitutional vagueness, the honest-services fraud statute, 18 U.S.C. § 1346, "criminalizes only . . . bribe-and-kickback" honest-services fraud schemes. *See Skilling*, 130 S. Ct. at 2932. Thus Martignoni contends he was convicted on these three counts in part for conduct that the Supreme Court has ruled not to be criminal. At oral argument, the Government acknowledged that the *Skilling* holding may be applied retroactively in a collateral attack on a conviction, but argued that despite the retroactive applicability of *Skilling*, *coram nobis* relief was unavailable because a reasonable jury could have found Martignoni guilty of making false entries in bank records. (Oral Arg. Tr. 25:5-6.) The Government has not claimed that Martignoni's case involved bribes or kickbacks, but has suggested that Martignoni is procedurally barred from contesting the validity of the fraud and conspiracy counts.

*Skilling* clearly sets forth the development of the "honest services" theory of fraud, and there is no need to repeat that full history in this Opinion. Suffice it to say, in 1987, the Supreme Court held that the mail and wire fraud statutes were "limited in scope to the protection of property rights." *McNally v. United States*, 483 US 350, 360 (1987). Therefore, the "deprivation" of the "intangible right to honest services" alone was deemed not criminal in *McNally*, but the Supreme

Court seemed to recognize that Congress could deem such a deprivation criminal. *Id.* ("If Congress desires to go further, it must speak more clearly than it has.")  Subsequently, Congress enacted 18 U.S.C. § 1346, which states in full that "[f]or purposes of [Chapter 63 of Part I of Title 18 of the United States Code], "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."  The Supreme Court in *Skilling* held this language unconstitutionally vague when applied to schemes that do not involve a bribe or a kickback, because only schemes involving bribes and kickbacks were frequently prosecuted as "honest services" cases prior to *McNally*. *Skilling*, 130 S. Ct. at 2932–33.

As noted, at oral argument, the Government has admitted the retroactive application of *Skilling* on collateral review. (Oral Arg. Tr. 25:6.)  A verdict must be "set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." *Yates v. United States*, 354 U.S. 298, 312 (1957), *overruled on other grounds by Burks v. United States*, 437 U.S. 1, 98 (1978).  However, on both collateral review and direct appeal, a court must determine whether a defendant has been substantially prejudiced by the erroneous instruction. *See Hedgpeth v. Pulido*, 555 U.S. 57, 59 (2008).

It is clear that the instructions given in Martignoni's trial relating to the honest-services theory of fraud substantially prejudiced Martignoni in light of *Skilling*.  The jury was instructed, under valid Second Circuit law at the time, that it could find Martignoni guilty of bank fraud and conspiracy if it found that Martignoni had the intent to deprive his employer of its intangible right to his honest services.  I even responded to a note from the jury, asking that I clarify the honest services theory of fraud.  The answer given to the jury preceded the Supreme Court's *Skilling* decision by sixteen years and was consistent with Second Circuit precedent.  In addition to the jury instructions, the argument presented by the Government contributed to the prejudice against

Martignoni.  The Government made the honest services theory a central feature of Counts One, Fifteen, and Sixteen.  In its opening, the Government stated:

> This is a case about fraud.  It is not about a fraud to obtain money or a car or jewelry.  It is about a fraud relating to something that you cannot see or touch.  It is something intangible and it's something that the law recognizes as the intangible right to honest services.  You will recognize it as just plain trust.  The case is about the kind of trust that a business . . . placed in every one of its employees to perform a honest job, the kind of trust that should allow a businesslike bank [sic] to operate knowing it's receiving accurate information about what is happening with its money. . . .  Mr. Martignoni didn't steal the bank's money but he stole its right to his honest services as a trusted employee, and that's what the evidence is going [to] show you.

(Trial Tr. 14:1–13, 15:1–3.)  Similar statements were made in the Government's closing arguments. The Government tried this case as a deprivation of honest services case that did not include bribes or kickbacks, and introduced evidence from which a reasonable jury could have concluded that Martignoni had no intent to deprive his employer of any property but did intend to deprive ABN AMRO of his "honest services," as that term was then understood.  A reasonable jury could have also concluded that Martignoni and Burch did not conspire to make false entries in bank records.

The focus of the trial was on an honest services theory, and Martignoni was substantially prejudiced by the presentation of this theory.  Counts One, Fifteen, and Sixteen cannot stand in light of the Supreme Court's decision in *Skilling*.

## 2.    Prejudicial Spillover and Counts Two through Fourteen

Martignoni contends that, although not directly impacted by the Supreme Court's *Skilling* decision, the jury's verdict with respect to Counts Two through Fourteen should also be invalidated because the focus of the Government's case was overwhelmingly on its honest services fraud allegations and therefore the jury was prejudiced with respect to these counts by the introduction of evidence pertaining primarily to the honest-services fraud counts.  In order to determine whether a defendant was prejudiced by the introduction of evidence related to invalid charges, a district court must determine whether the evidence introduced was "inflammatory," whether the dismissed counts

and the remaining counts were similar, and whether the Government's evidence on the remaining counts was weak or strong. *United States v. Vebeliunas*, 76 F.3d 1283, 1294 (2d Cir. 1996).

In this case, the vast majority of the evidence presented to prove the Government's invalid conspiracy and bank fraud charges would have been admissible to prove that Martignoni knew the volatilities submitted to the back office were unreasonably high and did not reflect market prices. As the Second Circuit has recognized, "where the vacated and remaining counts emanate from similar facts, and the evidence introduced would have been admissible as to both, it is difficult for a defendant to make a showing of prejudicial spillover." *United States v. Wapnick*, 60 F.3d 948, 954 (2d Cir. 1995). Because the Petitioner has failed to identify any "spillover," the Court cannot invalidate these counts on a prejudicial spillover theory.

However, any evidence that might have been inadmissible had Martignoni been charged only with Counts Two through Fourteen was not "prejudicial" in the sense that it would "have tended to incite or arouse the jury into convicting the defendant on the remaining counts." *Vebeliunas*, 76 F.3d at 1294 (quoting *Wapnick*, 60 F.3d at 953). The jury was carefully instructed with regard to Counts Two through Fourteen. The jury was told that in order to find that Martignoni made false entries in bank records in violation of 18 U.S.C. § 1005, it had to find that the false entries were made "willfully, with the intent [to] injure or defraud the bank or to deceive its officers." (Trial Tr. 1438:1–2.) I also instructed the jury that, with respect to these counts, it was not "necessary for the [G]overnment to prove that the bank actually suffered any loss." (*Id.* 1439:7–9.) Except as they related to the conspiracy charge, at no point in the jury instruction were the false entry charges associated with honest services fraud. Finally, the Government presented strong evidence that Martignoni knew the inflated volatilities caused the values of the Sterling Options to appear far higher than the market price of similar options. Therefore, Counts Two through Fourteen stand.

– 17 –

**B.     Legal Consequences of Conviction That Can Be Remedied by Granting the Writ**

Deportation is clearly a legal consequence of conviction sufficient to warrant *coram nobis* relief where all other requirements are satisfied, and the Government does not argue otherwise. Rather, the Government argues that *coram nobis* relief should be barred in this case because Martignoni's conviction with respect to Counts Two through Fourteen is valid and these charges are "aggravated felonies" within the meaning of INA § 101.  Therefore, according to the Government, Martignoni is subject to removal due to Counts Two through Fourteen, and therefore the issuance of a writ of error *coram nobis* will not remedy the consequences that Martignoni seeks to remedy.

Though I deny the Petition with respect to Counts Two through Fourteen because those counts were properly charged to the jury, denial of the Petition with respect to Counts Two through Fourteen does not preclude issuance of a writ of error coram nobis with respect to the other counts. The Government has not pointed to any specific evidence or finding by a court suggesting the appropriate value of ABN AMRO's losses related to Counts Two through Fourteen.  I instructed the jury that the Government was not required to show any loss for the jury to find Martignoni guilty under 18 U.S.C. § 1005.  And neither the Boston Immigration Court, nor the BIA addressed the issue of whether Counts Two through Fourteen constituted "aggravated felonies." Furthermore, the Government has not articulated a specific loss amount that may be attributed to the conduct underlying Counts Two through Fourteen, but instead refers at times to trading losses of $70 million, at other times to an allegation that ABN AMRO incurred $20 million in costs when it unwound Martignoni's positions, and at still other times to commissions of $51,600 allegedly paid by ABN to purchase the Sterling Options.  However, Counts Two through Fourteen relate not to all of Martignoni's trading activity during the fall of 1991 and not to the Sterling Option purchases themselves, but to the subsequent inflation of volatilities for the Sterling Options which was then

reported to the back office.  There is no evidence of how much ABN AMRO lost specifically as a result of these inflated volatilities.

The Government argues that Martignoni has the burden to show that Counts Two through Fourteen are not "aggravated felonies."  If the Government could articulate some loss amount in the record reasonably stemming from the conduct charged in Counts Two through Fourteen, or if some court had made a specific loss finding unrelated to the invalid counts of the Indictment, Martignoni might have such a burden.  It is ultimately up to the immigration courts and eventually the Courts of Appeals to determine whether an offense constitutes an "aggravated felony."  Before me is only the question of whether permitting Counts Two through Fourteen to stand precludes *coram nobis* relief on Counts One, Fifteen, and Sixteen.  I cannot find facts in any of the Government's papers or in the trial record to support the Government's argument.

## C.      Sounds Reasons for Failure to Seek Appropriate Earlier Relief

The Court finds that Martignoni has demonstrated sound reason for his failure to seek appropriate earlier relief.  The legal basis of Martignoni's Petition depends entirely on the scope of the Supreme Court's ruling in *Skilling*, and the Petition was filed less than 90 days after the Supreme Court decided *Skilling*.  This was a reasonable amount of time in which to research and prepare the Petition.  *Cf.* 28 U.S.C. § 2255(f) (providing a one-year statute of limitations for a § 2255 motion, running from the latest of various dates, including "the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review").  The Government does not argue that Martignoni could have filed his Petition at an earlier time or that he could have sought equivalent relief through another action at an earlier time.

Furthermore, Martignoni challenged the constitutionality of the honest-services fraud statute on vagueness grounds during the direct appeal of his criminal case and at the trial stage. Therefore, Martignoni did not waive the argument raised in his Petition.

**D.     Existence of Circumstances Compelling the Issuance of the Writ to Achieve Justice**

The existence of ongoing legal consequences of a conviction determined to be invalid is not sufficient to entitle a petitioner to relief through a writ of error *coram nobis*. *Morgan*, 346 U.S. at 511. A district court may grant a writ of error *coram nobis* only when necessary "to achieve justice." *Nicks*, 955 F.2d at 167. In elaborating on the unusual nature of this writ of error, albeit in the context of military courts, the Supreme Court has held that:

> [J]udgment finality is not to be lightly cast aside; and courts must be cautious so that the extraordinary remedy of *coram nobis* issues only in extreme cases. But the long-recognized authority of a court to protect the integrity of its earlier judgments impels the conclusion that the finality rule is not so inflexible that it trumps each and every competing consideration. Our holding allows . . . courts to protect the integrity of their dispositions and processes by granting relief from final judgments in extraordinary cases when it is shown that there were fundamental flaws in the proceedings leading to their issuance.

*United States v. Denedo*, 129 S. Ct. 2213, 2223 (2009).

This is an extraordinary case.

Martignoni seeks to disturb the finality of the judgment against him for the concrete purpose of preventing him from being separated from his family by deportation. The Government, not Martignoni himself, disturbed the status quo when it initiated removal proceedings in 2008, six years after re-approving Martignoni's status as a lawful permanent resident. When the Government initiated removal proceedings, Martignoni had served his full sentence—a sentence that was not appealed by the Government. He had requested the initiation of proceedings to determine the legitimacy of his status when discretionary relief would have been available, but instead the Government delayed proceedings. Since that delay, the immigration laws changed, making the discretionary forms of relief unavailable. This result is at least, as noted by the BIA, "unfortunate,"

and in my view worse than that.  In light of the fact that Martignoni was prosecuted principally under a statute that has since been determined by the nation's highest court to be "unconstitutionally vague" when applied to defendants like the Petitioner, this result is unjust as well.

The Government has articulated no legal basis for the removal of Martignoni from this country other than the March 1994 criminal judgment.  The Government has provided no reason at all for removing Martignoni, now an apparently law-abiding and tax-paying resident of the United States whose American children and wife reside here.  When questioned at oral argument about this issue, the Government responded that "the body that is carrying on the immigration proceedings is not the U.S. Attorney's office," but is the Department of Homeland Security. (Oral Arg. Tr. 21:20–22.)

The Petitioner has presented a persuasive case that *coram nobis* relief is required to cure the defects in his conviction and perhaps prevent his deportation.  In response, the Government has presented no argument at all explaining why failure to grant the writ would be just or reasonable.  Therefore, mindful of the extraordinary nature of this writ, I find that there are circumstances compelling the issuance of a writ of *coram nobis* to achieve justice.

### III. Conclusion

The Petition for a Writ of Error *Coram Nobis* [Civil Docket No. 1] is granted with respect to Counts One, Fifteen, and Sixteen, but denied with respect to Counts Two through Fourteen. Counts One, Fifteen, and Sixteen of the criminal judgment dated March 15, 1994 [Criminal Docket No. 60] are vacated.

**SO ORDERED.**

Dated:    New York, New York
          October 7, 2011

John F. Keenan
United States District Judge